# United States Court of Appeals
## For the First Circuit

No. 06-1254

UNITED STATES OF AMERICA,

Appellee,

v.

WILLIAM AHRENDT,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Lipez, Meritt,* and Howard,
Circuit Judges

David A.F. Lewis for appellant.
Renée M. Bunker, Assistant United States Attorney, with whom
Paula D. Silsby, United States Attorney, was on brief, for
appellee.

March 19, 2009

---

* Of the Sixth Circuit, sitting by designation.

**HOWARD**, **Circuit Judge**. William Ahrendt[1] challenges his cocaine conspiracy conviction and 210-month sentence. He alleges that the district court committed two errors at trial: declining to order a reevaluation of his competency and excluding evidence of a psychological evaluation. He also alleges that the court committed two errors at sentencing by applying a leadership enhancement and by failing to treat certain prior offenses together when evaluating his criminal history.

## I. Background

The following background facts on Ahrendt's role in the cocaine conspiracy were elicited at Ahrendt's trial.

During the relevant time, Ahrendt lived in Bangor, Maine, in an apartment from which he allowed others to "come and go." He sold drugs out of his apartment, and provided drugs for people to use while in his apartment. In November 2003, he met Sandra Hurd, who took advantage of Ahrendt's "very high clientele" to "set up shop" in his apartment selling drugs. Hurd solicited two other individuals, Randy Brimley and Kelvin Deloatch, for the operation. Hurd, Brimley and Deloatch were generally responsible for bringing multiple shipments of cocaine per week from Massachusetts to Bangor, Maine.[2]

---

[1] This appeal is captioned "United States v. Aherndt," but we will spell appellant's surname as he spelled it at trial: Ahrendt.

[2] Other individuals were active in the conspiracy, but their roles are not relevant here.

-2-

On arrival in Bangor, some of the cocaine would be taken to Ahrendt's apartment, although most of it was stored elsewhere in Bangor. If there was not enough cocaine at Ahrendt's apartment, someone other than Ahrendt would be dispatched to another location in Bangor to replenish supplies. In Ahrendt's apartment, the cocaine was weighed, packaged and sold to buyers who would come to the apartment. Ahrendt was one of the people who would weigh the cocaine. He was also one of the sellers, although Deloatch sold the lion's share. In addition, some of the powder cocaine was cooked into crack cocaine in the apartment. Brimley did most of the cooking, although Ahrendt also cooked small quantities of powder into crack. If either Deloatch or Brimley were present, one of them would take money from the drug sales to store it elsewhere in Bangor; if not, Ahrendt would hold the money until Deloatch or Brimley arrived.

At his trial, Ahrendt acknowledged that he used drugs himself, sold drugs, and gave drugs to other people. He also acknowledged that he weighed cocaine with his own scales, packaged it, and cooked powder cocaine into crack. He testified, however, that he was not part of the conspiracy, that he was an "outsider" and "kept in . . . the dark." He testified that he "didn't have any specific arrangements with these individuals . . . . They came and went, just like everybody else that came in my door."

Several months of police investigation culminated in the arrest of seven people, including Ahrendt, in April 2004. After Ahrendt's arrest and his pre-trial incarceration at Fort Devens, Massachusetts, issues arose as to his competency to stand trial. On motion of his counsel, Ahrendt was evaluated by a forensic psychologist on staff at Fort Devens who submitted a written report to the court. This report relied on Ahrendt's mental health records from both the Bangor Mental Health Institute (BMHI) and from Acadia Hospital in Bangor, as well as on interviews with Ahrendt.

Ahrendt had been hospitalized at BMHI from December 2001 to April 2002. He was treated for symptoms including suicidal impulses, poor concentration and disorganized thoughts; treated with antidepressants and an antipsychotic drug; and given multiple diagnoses (Major Depressive Disorder, Posttraumatic Stress Disorder and Antisocial Personality Disorder). Between 2002 and 2004, Ahrendt was treated on an outpatient basis at Acadia Hospital in Bangor for "mood alterations, vague complaints of auditory hallucinations, and multiple suicide threats." He was further diagnosed with Major Depression, Recurrent, With Psychotic Features; History of Posttraumatic Stress Disorder Not Otherwise Specified; and Personality Disorder with Histrionic and Narcissistic Features. He was treated with a variety of

psychotropic medications.  Neither set of records discussed Ahrendt's substance use.

The report posited that because Ahrendt was using drugs during the pendency of his prior hospitalizations, his "degree of drug use could possibly explain" the symptoms reported in his medical records.  The report concluded by diagnosing Ahrendt with Personality Disorder Not Otherwise Specified and with substance use-related diagnoses, but noted that these diagnoses did not "appear to be impairing his level of functioning to consult with his attorney or make rational decisions regarding his legal matters."

After the submission of the report, the district court held a competency hearing in January 2005.  At that hearing, the report was admitted into evidence without objection.[3]  The court also engaged in a discussion with Ahrendt about his competency, asking if he understood what was happening and explaining the legal standard for competency in response to Ahrendt's questions. At the conclusion of the hearing, the court ruled Ahrendt competent to stand trial, pledging to "remain diligent regarding [the competency] issue during the course of any further proceedings."

---

[3]  Defense counsel mentioned that Ahrendt disagreed with some of the specific statements that Ahrendt had allegedly made to the psychologist, but acknowledged that those statements did not affect the conclusions in the report.

At around this time, Ahrendt began sending letters to the court. The letters expounded upon Ahrendt's personal philosophy and view of the justice system.[4] At an April 2005 hearing on an unrelated issue, the court commented that "the letters could be interpreted as threatening." Ahrendt's counsel responded that the letters were not threatening, and that Ahrendt was "a person who just lives in a different world than the rest of us."

At a May 2005 hearing on a request for a continuance, Ahrendt's counsel reported that his client had been evaluated by mental health professionals and in counsel's opinion, "there are some serious problems there." At a July hearing on counsel's motion to withdraw, which was denied, the court questioned Ahrendt about his relationship with counsel. Ahrendt stated, "it basically comes down to, sir, [that] your law stands against my beliefs, and I'd like to represent my beliefs against your law, and that's it. My law stands for love, and yours stands against the Almighty God, and that's the battle." Ahrendt explained that he wanted to

---

[4] We present a representative sampling of excerpts from Ahrendt's letters. More than thirty letters were filed with the district court between April 2005 and January 2007.
    (1) "Follow your way sir and impose your justice. I hope your soul was worth it!"
    (2) "I liked our chat in your room of truth. I desire, and would appreciate if we could do it again?"
    (3) "I have already shown the Truth of you and your kind and of what is it. HAHAHA! This Trial is 'you' nailing 'your' own coffin shut. For Real. You seem to believe you are what makes up Reality, the Truth. NOT! Wow, what a lust sir."

"change [the justice] system" and asked the court, "Why don't you help me do what I'm trying to accomplish?"

As trial approached, Ahrendt's counsel filed a notice of intent to introduce as expert evidence the testimony of clinical psychologist Dr. Jeffrey Aston. Based on interviews with Ahrendt, Dr. Aston had prepared testimony that agreed with the Fort Devens Report that Ahrendt was "technically competent," and offered further explanation of Ahrendt's point of view and behavior.

> [Ahrendt] is obviously given to a peculiar turn of mind which interprets everything in terms of a highly abstracted philosophy of life . . . . In Mr. Ahrendt's view, the world consists of persons who are motivated either by negative selfishness ("Lust") or positive altruism ("Love"). For him, drug use resembles an almost sacramental consumption of what the "Divine" Lovingly provides us, while society's war on drugs is a misguided Lust to control what others do.

The government filed a motion in limine seeking to exclude this testimony. The court agreed with the government and ruled the proffered testimony inadmissible under Fed. R. Evid. 403, explaining that the testimony had "a significant potential for confusing and misleading the jury and causing unfair prejudice." The court noted that such testimony might invite jury nullification, stating, "[t]he sincerity of Mr. Ahrendt's belief that he is entitled to the 'sacramental consumption' of drugs is not properly before the Court."

-7-

Several weeks before trial, the court permitted Ahrendt to waive his right to counsel and represent himself, with his former counsel serving as standby counsel. At this time, his counsel had expressed concern that Ahrendt would not pursue a sensible defense strategy. The court specifically asked if counsel was requesting a reevaluation of Ahrendt's competency, and counsel replied that he could not make such a request "in good faith."

At trial in September 2005, Ahrendt cross-examined the government's witnesses, eliciting testimony bearing on the credibility of at least one witness, and made a successful hearsay objection. Ahrendt also testified in his own defense. Despite his efforts, the jury convicted Ahrendt of conspiracy to distribute, and to possess with the intent to distribute, both cocaine and cocaine base under 21 U.S.C. §§ 846 & 841(a)(2).

In the presentence investigation report ("PSR") prepared for Ahrendt's sentencing, he was given a two-level leadership enhancement under U.S.S.G. § 3B1.1(c) for his role in the conspiracy. The resulting offense level was thirty-four. The PSR also listed four prior convictions. Although Ahrendt had been sentenced for three of those offenses on the same day, and the three offenses had occurred within one week of each other and had similar characteristics, each conviction was counted separately, as a "prior sentence" under § 4A1.2(a)(2). Ahrendt was accordingly awarded eight criminal history points, putting him in Criminal

History Category ("CHC") IV. See § 4A1.1 (two points awarded for each prior sentence of imprisonment of at least sixty days). Ahrendt's Guidelines Sentencing Range ("GSR"), based on an offense level of thirty-four and a CHC of IV, was 210 - 262 months.

The court remarked at the commencement of the sentencing hearing in January 2006 that it wanted to be as fair as possible to Ahrendt, who responded, "Let me go home?" When Ahrendt was asked if he objected to any of the findings, he stated that he objected to "[t]he whole thing." The district court responded, "Defendant's objection is noted and overruled" and the findings of the PSI were adopted. Ahrendt was sentenced to the low end of the GSR, 210 months' imprisonment, followed by four years of supervised release. The court asked Ahrendt if he had any specific objection to those terms, to which Ahrendt responded, "Disrespect is disrespect. That's all right." The court stated, "To the extent that is interpreted as an objection, the objection's overruled."

On appeal, Ahrendt argues that the district court erred in declining to order a reevaluation of his competency. He also claims error in the court's exclusion, under Fed. R. Evid. 403, of the psychological evaluation prepared by Dr. Aston. Ahrendt also alleges sentencing errors in both the leadership enhancement and the separate counting of his prior convictions.

## II.  Discussion

### A.  Competency

A district court's competency determination, made after a hearing on the defendant's competency to stand trial, will be upheld unless clearly erroneous.  United States v. Lebrón, 76 F.3d 29, 32 (1st Cir. 1996).

Ahrendt argues that despite the court's finding at the competency hearing in January 2005 that he was in fact competent to stand trial, later events cast sufficient doubt on that conclusion such that the court should have ordered a reevaluation.

Determining competency to stand trial involves an inquiry into whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as factual understanding of the proceedings against him."  Dusky v. United States, 362 U.S. 402, 402 (1960) (per curiam).  The obligation to determine competency to stand trial is continuing, and persists throughout a proceeding including through the sentencing phase. See Drope v. Missouri, 420 U.S. 162, 181 (1975) ("Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial.") A court must order a competency hearing on motion from either the defense or the government, or sua

-10-

sponte, "if there is <u>reasonable cause</u> to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241 (emphasis added).

Ahrendt points specifically to two sets of communications -- statements made by his counsel throughout the proceedings, and Ahrendt's own statements and letters -- that he maintains demonstrated the need for a reevaluation of his competency. Ahrendt points to his counsel's statements that "[Ahrendt] is a person who just lives in a different world than the rest of us" and "there are some serious problems there," and also cites comments at a September 2005 hearing reflecting concern over Ahrendt's defense strategy. In addition Ahrendt argues that his own statements indicate both that he was not fully aware of the nature of his trial and sentencing, and that he was generally divorced from reality. He cites his request that the trial court help him accomplish his goal of changing the justice system, his comment at his sentencing "Let me go home?" and the letters that he continued to send to the court.

Neither counsel's statements nor Ahrendt's own statements reach the "reasonable cause" threshold to require a sua sponte hearing. Although defense counsel has a "unique vantage for

observing whether her client is competent," United States v. Muriel Cruz, 412 F.3d 9, 13 (1st Cir. 2005), counsel's observations about "serious problems" and Ahrendt "liv[ing] in a different world" are not of a tenor that would suggest cause to conduct a competency evaluation. This is particularly true in the context of Ahrendt's performance at trial, where he made a successful hearsay objection and cross-examined government witnesses in an attempt to show that the requirements for proving a conspiracy were not met. While ultimately unsuccessful, his performance belies the contention that he was "unable . . . to assist properly in his defense." 18 U.S.C. § 4241. We also note that after the competency hearing, the district court took an active role in assessing Ahrendt's competency through the pendency of the proceedings. The court and Ahrendt had lengthy discussions on multiple occasions -- the hearings in July and September, at trial, and at sentencing -- in which the judge questioned Ahrendt about his understanding of various aspects of the process.

As to Ahrendt's own statements, we note that a defendant's failure to grasp how the legal system and the sentencing process operate can constitute reasonable cause for a court to sua sponte order a competency evaluation. See, e.g., United States v. Giron-Reyes, 234 F.3d 78, 83 (1st Cir. 2000) (defendant's apparent inability to understand critical aspects of the proceedings, including the role of the jury and the Sentencing

Guidelines, suggested that defendant may not have been competent). But Ahrendt's comments do not convey the lack of understanding evidenced in Giron-Reyes. Ahrendt both demonstrated an understanding of and participated in the proceedings. Although Ahrendt argues that his letters to the court changed demonstrably in tone and content during the pendency of the proceedings such that the letters should have triggered a reevaluation of his competency, counsel reported prior to trial that the letters had been reviewed by Dr. Aston, who had not expressed an opinion that there had been a change in Ahrendt's competency.

Short of reasonable cause to believe that Ahrendt was mentally incompetent to stand trial, the district court was not obligated to order a reevaluation. In light of Ahrendt's demonstrated understanding and participation in the trial, neither his own communications alone, nor in combination with statements by counsel, constituted reasonable cause. Ahrendt had been evaluated by qualified mental health professionals, both prior to the initial competency hearing (the Fort Devens Report) and after it (the Aston testimony). We have interpreted a qualified mental health professional's report to be an important factor for the trial court to consider when determining competency. See United States v. Bruck, 152 F.3d 40, 47 (1st Cir. 1998) (when psychiatrist has found defendant to be competent, trial court need not hold a competency hearing absent extenuating circumstances); see also Lebrón, 76 F.3d

-13-

at 32 (same).  Here, the district court was presented with first such reports, both of which concluded that Ahrendt was competent to stand trial.  We cannot say that it was clear error for the district court to decline to order a reevaluation of Ahrendt's competency to stand trial.

## B.  403 Ruling

Evidentiary rulings of the district court are reviewed for an abuse of discretion.  United States v. Turner, 501 F.3d 59, 72 (1st Cir. 2007).

Ahrendt argues that because the government was required to prove specific intent to convict him of the conspiracy charge, the exclusion of the proffered expert testimony of Dr. Aston (describing Ahrendt's view of drug use as "sacramental consumption") was erroneous.  Such testimony, he says, would have been probative to his ability, vel non, to form the requisite intent.

A defendant is allowed to present mental-condition evidence short of establishing insanity under 18 U.S.C. § 17(a) if the evidence is relevant to determining the defendant's ability to form the requisite intent to commit the crime.  United States v. Schneider, 111 F.3d 197, 201 (1st Cir. 1997).  Even if relevant, though, such evidence may be excluded if its "probative value may be substantially outweighed by confusion or delay" or if the evidence is from an expert and fails to "meet the further

-14-

requisites of scientific reliability and helpfulness to the jury."
Id., at 201; Fed. R. Evid. 702.

The government is indeed required to prove specific intent, see 21 U.S.C. § 841(a)(2), but Dr. Aston's testimony would have had no bearing on this question. Ahrendt's beliefs in a higher law are not probative of his ability to form the requisite intent. See United States v. White, 766 F.2d 22, 24 (1st Cir. 1985) (evidence of motivation for violating law, in this case influence of defendant's mother, irrelevant if defendant is capable of forming specific criminal intent.) Moreover, even if relevant, Dr. Aston's testimony had significant potential to confuse or mislead the jury. As the district court said,

> Dr. Aston may not give voice to and implicitly legitimize what he describes as Mr. Ahrendt's 'deviant' set of values without effectively promoting jury nullification . . . . Further, Dr. Aston's testimony could mislead the jury into thinking that Mr. Ahrendt's idiosyncratic philosophy amounts to a form of temporary insanity or ameliorates the offense . . . .

See Schneider, 111 F.3d at 201 (in assessing medical evidence offered regarding to defendant's ability to form requisite intent, district court is "closer to the case" and has "comparative advantage"). The district court did not abuse its discretion in excluding the testimony.

### C. Sentencing

The government argues that although Ahrendt may have made two generic objections at sentencing, he never objected to the

particular issues he now appeals: the leadership enhancement under U.S.S.G. § 3B1.1(c), and the classification of his prior convictions under § 4A1.2(a)(2). See United States v. Jimenez, 512 F.3d 1, 7 (1st Cir. 2007) (defendant's failure to object to particular findings of PSR waives objection). Ahrendt told the court that he objected to the "whole thing" and that "[D]isrespect is disrespect. That's all right." Even we were to adopt a generous stance in light of Ahrendt's pro se status at sentencing, his generic objections cannot be fairly interpreted as giving notice to the court of these two very specific issues. Thus we apply plain error review. United States v. Olano, 507 U.S. 725 (1993).

To succeed on plain error review, Ahrendt must show: "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001).[5] With respect to factual determinations, "[an]

---

[5] We have at times applied a flexible standard in the sentencing context with respect to the third and fourth prongs of plain error review. United States v. Antonakopoulos, 399 F.3d 68, 78 (1st Cir. 2005); see also United States v. Dominguez Benitez, 542 U.S. 74, 81-82 (2004). To meet the third prong, that the error "affected the defendant's substantial rights" in the sentencing context, a defendant must show on the sentencing record "a reasonable probability that, but for the error, the district court would have imposed a different, more favorable sentence." United States v. Gilman, 478 F.3d 440, 447 (1st Cir. 2007) (citing United States v. Turbides-Leonardo, 468 F.3d 34, 39 (1st Cir. 2006)) (internal

-16-

error cannot be clear or obvious unless the desired factual finding is the only one rationally supported by the record below." United States v. Goodhue, 486 F.3d 52, 57 (1st Cir. 2007) (quoting United States v. Donnelly, 370 F.3d 87, 95 (1st Cir. 2004)) (internal quotation marks omitted).  Where the issue is a district court's interpretation of the Guidelines, we will not find clear or obvious error if the "challenged issue of law is unsettled." Goodhue, 486 F.3d at 57.

We can dispense quickly with Ahrendt's objection to the leadership enhancement as he fails to meet even the first hurdle of plain error review.  Ahrendt makes two arguments:  first, that the record does not adequately support the imposition of a leadership enhancement; and second, that the district court inadequately considered the 18 U.S.C. § 3553(a) factors in this regard.

The Guidelines impose a two-level increase to a defendant's offense level based on that defendant's status -- that he or she acted as "an organizer, leader, manager, or supervisor in any criminal activity other than [an activity involving five or more participants or that was otherwise extensive]."  U.S.S.G. § 3B1.1(c); see also United States v. Thiongo, 344 F.3d 55, 61-62 (1st Cir. 2003); United States v. Tejada-Beltran, 50 F.3d 105, 111

---

quotation marks omitted).  To meet the fourth prong, a defendant must then show that "leaving the error uncorrected would cause a miscarriage of justice."  United States v. McCoy, 508 F.3d 74, 80 (1st Cir. 2007).

(1st Cir. 1995). Relevant factors to consider include "the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1 cmt. n.4.

Ahrendt's leadership status is borne out by the record. He may not have been the ringleader of this operation, but he had some authority within the conspiracy in that he rented the apartment where drugs were processed, packaged and sold, and held money for short periods of time. He also played a role in "organizing," as he provided the clientele in Bangor. Classifying a defendant's role in a particular criminal enterprise is a "fact-specific task," Thiongo, 344 F.3d at 62, and the district court's determination that Ahrendt's role merited a two-level leadership enhancement was not error.

Further, the district court did not, as Ahrendt now argues, inadequately consider § 3553(a)(6): the "need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." Ahrendt maintains that the disparity between his sentence of 210 months and Brimley and Deloatch's sentences of forty-two and sixty-six months, respectively, was unwarranted. But in addition to having different criminal history profiles, Brimley and Deloatch pled guilty and so were not "similarly situated" for sentencing purposes. See United States v. Tom, 504 F.3d 89, 95 (1st Cir. 2007), vacated and

remanded on other grounds in Tom v. United States, 128 S. Ct. 1132 (2008). Moreover, "section 3553(a)(6) aims primarily at the minimization of disparities among defendants nationally." Martin, 520 F.3d at 94. Again, there was no error in the imposition of the leadership enhancement.

Ahrendt's more significant objection to his sentence concerns his argument that his prior convictions were erroneously counted as separate "prior sentences" under § 4A1.1(a)(2).[6] Specifically, Ahrendt contends that the district court should have "consolidated" three of his four prior convictions because they occurred "in a single temporal cluster" and because he was sentenced for them by the same court on the same date.

Ahrendt was sentenced in January 2006 under the 2004 version of the Guidelines. The relevant language provides: "prior sentences [for non-violent crimes] imposed in unrelated cases are to be counted separately. Prior sentences imposed in related cases are to be treated as one sentence . . . ." U.S.S.G. § 4A1.2(a)(2) (2004). "Related cases" are defined in the application notes to § 4A1.2(a)(2) as follows: "[P]rior sentences are considered related

---

[6]   Ahrendt also argues on appeal that the court inadequately considered the 18 U.S.C. § 3553(a) factors in this regard. He contends that § 3553(a)(1) compelled consideration of his mental health issues in analyzing whether his prior convictions were unrelated. He does not develop any argumentation as to why those mental health issues are relevant to this determination, and we consider this argument waived. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

-19-

if they resulted from offenses that (A) occurred on the same occasion, (B) were part of a single common scheme or plan, or (C) were consolidated for trial or sentencing." Id. at cmt. n.3.

The "consolidation" factor is at issue here. At the time of Ahrendt's sentencing, we had made clear that with respect to consolidation,

> When dealing with 'offenses that are temporally and factually distinct (that is, offenses which occurred on different dates and which did not arise out of the same course of conduct), charges based thereon should not be regarded as having been consolidated (and, therefore 'related') unless the original sentencing court entered an actual order of consolidation or there is some other persuasive indicium of formal consolidation apparent on the face of the record . . .

United States v. Martins, 413 F.3d 139, 151 (1st Cir. 2005) (quoting United States v. Correa, 114 F.3d 314 (1st Cir. 1997). Moreover, our rule was that a defendant could not show consolidation merely by indicating that the "sentence was imposed by the same judge at the same time." Id. (emphasis added).

In Ahrendt's case, the district court committed no error, much less plain error, when it counted Ahrendt's three convictions separately under § 4A1.2(a)(2). The record evidence supports a finding that the offenses were temporally and factually distinct. Ahrendt's three offenses occurred in Maine on March 14, March 15, and March 19, 2001 respectively. The first two of these were violations of a protection from abuse order prohibiting Ahrendt's

contact with his ex-spouse and the third was a violation of a condition of release that he not have contact with her. Moreover, the record reveals neither a formal order consolidating the charges nor any other evidence of formal consolidation.

Nevertheless, on November 1, 2007, while this appeal was pending, the Sentencing Commission adopted a non-retroactive amendment[7] on this topic, in response to conflicts among the circuits. U.S.S.G. § 4A1.2(a)(2) (2007) & Supp. to App. C, Amendment 709 (2007). The amendment strikes the term "related cases" and the above definition from the 2007 Guidelines, and adds new language such that § 4A1.2(a)(2) now reads: "[P]rior sentences are counted separately unless (A) the sentences resulted from offenses contained in the same charging instrument; or (B) the sentences were imposed on the same day. Count any prior sentence covered by (A) or (B) as a single sentence." (emphasis added). Because Amendment 709 is non-retroactive, however, Ahrendt is not entitled to the benefit of this amendment which we have observed

---

[7] Retroactivity of amendments to the Guidelines is determined by the inclusion of such an amendment under U.S.S.G. § 1B1.10(c) (2007). If an amendment is so listed, a defendant is permitted to move for a reduction in sentence under 18 U.S.C. § 3582(c)(2). An amendment not listed in § 1B1.10(c) does not have retroactive effect. Retroactivity in the Guidelines context is explicitly distinct from the effect of statutory changes. See United States v. Havener, 905 F.2d 3, 6 (1st Cir. 1990) (Breyer, J.) (distinguishing "common-law presumption that the repeal of a criminal statute resulted in the abatement of all prosecutions which had not reached final disposition in the highest court authorized to review them" from retroactivity of amendments to Guidelines (internal quotation marks and citations omitted)).

"go[es] beyond any circuit's reading of the previous rule in a manner favorable to the defendant." See United States v. Godin ("Godin II"), 522 F.3d 133, 134 (1st Cir. 2008).

That said, we understand that if Amendment 709 had been in operation during Ahrendt's sentencing, his three convictions would have been grouped. Although the three charges underlying the convictions had separate docket numbers, and although he was sentenced for each conviction separately, all three sentences were imposed on the same day. See § 4A1.2(a)(2) ("[P]rior sentences are counted separately unless (A) the sentences resulted from offenses contained in the same charging instrument; or (B) the sentences were imposed on the same day. Count any prior sentence covered by (A) or (B) as a single sentence.").

Ahrendt is foreclosed from arguing that, despite Amendment 709's non-retroactivity, we should nonetheless remand for resentencing in light of the amendment. Although a non-retroactive amendment could trigger a remand if that amendment is deemed "clarifying" rather than "substantive," in Godin II we concluded that Amendment 709 was substantive and not intended to be applied retroactively. 522 F.3d at 134.

Nevertheless, Godin II suggests that another course may be available. Like Ahrendt, Godin had prior convictions for which

she had been sentenced on the same day,[8] and, as in this case, the convictions had been counted separately in her PSR. Id. Also similar to the present case, at the time of Godin's sentencing the pre-Amendment version of the guidelines was in force, and we made clear in our decision that Godin's GSR remained valid. Id. at 135. Nevertheless, motivated by the discretion vested in district courts after Gall v. United States, 128 S. Ct. 586 (2007), to consider the Sentencing Commission's current thinking, we remanded for resentencing. We suggested that the amendment was a statement of the "Commission's current policy position . . . [that] may have some influence on the judge's ultimate discretionary choice of sentence." Id. at 136.

The government argues that taking a similar course here is not justified and seeks to distinguish this case from Godin II in three ways.

First, the government observes that, unlike Godin who preserved her consolidation argument below, Ahrendt failed to present the claim at sentencing and therefore must satisfy the exacting plain error standard. We do not think this distinction is of great significance in this case. We did not dwell on the standard of review in our decision to remand for resentencing in Godin II. Simply put, neither defendant was entitled, under either

_____

8    The prior offenses at issue were two burglaries of the same apartment building in the same week, for which she was sentenced on the same day.

-23-

a harmless error or plain error standard of review, to a remand because neither could show that an error occurred at sentencing.

Second, the government argues that Ahrendt, unlike Godin, never requested a departure or variant sentence. We do not think that this fact forecloses a remand. In Godin II, our decision to remand did not hinge on the fact that Godin sought a departure or variant sentence. Moreover, although the district court in this case noted Ahrendt's failure to pursue either of those options at sentencing, neither did the court suggest that it would be opposed to granting such a request, had one been made. Finally, we remain cognizant of Ahrendt's pro se status at sentencing. Although this status does not excuse him from the obligation to present colorable arguments at sentencing, under the circumstances of this case we do not weigh heavily Ahrendt's pro se failure to press an argument for a departure or variant sentence on the basis that U.S.S.G. § 4A1.2(a)(2), as it stood at the time, resulted in an unduly harsh sentence.

Third, the government points out that in Godin II the application of Amendment 709 would have prevented the defendant from being designated a career offender, thus significantly reducing Godin's Guidelines range. Therefore, its argument runs, we had a greater reason to remand for resentencing in Godin's case than here. Although perhaps not irrelevant, the difference in impact on the Guidelines calculation ultimately is a difference in

degree.  In Godin II, we emphasized the posture of the case in explaining our decision to remand.  We observed that, "[T]he posture of this case is peculiar:  the amendment is not applicable retroactively, but neither has the pending appeal yet resulted in a final disposition, that is, a disposition that is no longer subject to review on direct appeal in any court."  Id. at 135.  The posture of this case is the same.

Ultimately, given the similarities between this case and Godin II, we think a remand is justified.  Although the district court is under no obligation to modify Ahrendt's sentence, we nevertheless think it prudent to allow the court the opportunity to consider the Sentencing Commission's updated views.

For the reasons explained above, we **affirm** Ahrendt's conviction but **remand** for resentencing in light of Amendment 709.


**-Dissenting Opinion Follows-**

**MERRITT**, <u>Circuit Judge</u>, **dissenting**. I am under a duty as an appellate judge to review the length and reasonablenss of sentences, and I regard the 18-year sentence here for this nonviolent crime as unreasonably long and not sufficiently explained by the District Court.

With regard to the 18-year sentence, I do not agree with the District Court's two level enhancement of Ahrendt for performing a "leadership role" in the drug conspiracy and the court's failure to address the large disparity (12 and 14 years) between Ahrendt's sentence and the sentence of the real leaders and promoters of this group, co-conspirators Brimley and Deloatch. The pre-sentence report indicates that these two leaders brought in the drugs from Boston, collected the money and gave the instructions to the other members of the conspiracy. The pre-sentence report describes Ahrendt's role in the offense as follows: "Aherndt both sells cocaine and other drugs that include Percocet, Vicoden, Oxycontin and Methadone. In addition to sales, he was engaged in the cooking of the powder cocaine." Then the pre-sentence report makes the following recommendation as to Ahrendt's sentence:

> **Adjustments for Role in the Offense**: Pursuant to U.S.S.G. §3B1.1(c), there is a 2 level increase because the defendant was a manager or organizer of a criminal activity that involved five or more participants or was otherwise extensive. Although this office does not believe that the defendant held as high of management position as Brimley or Deloatch in this conspiracy, he was clearly the organizer of the distribution of crack and was involved in other drug distributions.

At the sentencing hearing the defendant was pro se and appears to object to all of the upward adjustments in the pre-sentence report. He has obviously suffered from mental illness and remains on the borderline, as the sentencing judge clearly recognized:

> THE COURT: I'm still not quite sure what to make of you. You certainly present as somebody who is somewhat iconoclastic, maybe a bit eccentric, and with a dose of nihilism, and I am not denying that you have a right to your own views about your use of drugs, and there is certainly a certain subsection of American society that would agree with you, but Congress doesn't.

I do not believe there are sufficient facts stated in the presentence report or by the court below to justify the enhancement. On this subject, all the sentencing judge said was:

> Three, pursuant to United States Sentencing Guideline Section 3B1.1(c), as the defendant was a manager or organizer of a criminal activity that involved five or more participants or was otherwise extensive, there is a two-level increase, bringing the offense level to 34.

There is no indication of what participants Ahrendt managed or how he "organized, led, managed or supervised them." See requirements of United States Sentencing Guidelines §3B1.1.

Neither can I find a justification for a 12-year disparity between Ahrendt's sentence and the real leaders of the group. It is true that the two leaders pled guilty and did not go to trial. But Ahrendt has the right of trial by jury and should

not be punished for exercising it.[9]  The sentence also fails to acknowledge the existence of § 3553(a)(6) which requires the sentencing judge to take into account the need to "avoid unwarranted disparity among defendants in the same case or provide a reasonable justification for this disparity."

---

[9]  See THE FEDERALIST No. 83 (Alexander Hamilton) ("The friends and adversaries of the plan of the convention, if they agree in nothing else, concur at least in the value they set upon the trial by jury; or if there is any difference between them it consists in this: the former regard it as a valuable safeguard to liberty; the latter represent it as the very palladium of free government."); see also Apprendi v. New Jersey, 530 U.S. 466, 498 (2000) (Scalia, J., concurring) (noting that "the jury-trial guarantee was one of the least controversial provisions of the Bill of Rights").