**Not for Publication in West's Federal Reporter**

# United States Court of Appeals
## For the First Circuit

---

No. 16-1508

UNITED STATES OF AMERICA,

Appellee,

v.

CORINTHIAN WRIGHT,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

---

Before

Howard, Chief Judge,
Stahl and Lynch, Circuit Judges.

---

Thomas J. O'Connor, Jr. on brief for appellant.
Richard W. Murphy, Acting United States Attorney, and Renée
M. Bunker, Assistant United States Attorney, on brief for appellee.

---

June 7, 2017

---

**STAHL**, **Circuit Judge**.  Appellant Corinthian Wright pled guilty to one count of conspiracy to distribute heroin and cocaine base, as well as two substantive counts charging him with possession with intent to distribute these controlled substances. These violations ultimately netted Wright a 96-month prison sentence, which he now challenges on appeal, alleging that the district court procedurally erred in applying two sentencing enhancements.  We disagree and AFFIRM.

## I. Facts & Background[1]

In early 2014, federal, state and local law enforcement agencies began investigating individuals believed to be transporting cocaine and heroin from New York to the Lewiston-Auburn area in Maine for resale.  The investigation included surveillance, controlled purchases, and court-authorized wiretaps. Several individuals were eventually identified as being involved in this illicit enterprise, including defendant-appellant Corinthian Wright (aka "Tanner"), Kendall Francis (aka "Dew"), Christian Dent, Rebecca Thompson, Randy Gosselin, and Willie Jackson.

It appears that Wright first arrived on the police's radar in November 2014, when an intercepted phone call led

---

[1] As this appeal follows a guilty plea, we recount the facts as established by the plea agreement, the presentence report, and the sentencing transcript.  United States v. King, 741 F.3d 305, 306 (1st Cir. 2014).

authorities to conclude that Dent was selling cocaine base out of an apartment at 24 Laurel Avenue in Auburn, Maine, where he resided with his girlfriend, Thompson. Acting pursuant to a search warrant, agents searched this apartment and discovered and seized a firearm hidden in the kitchen ceiling, 8.3 grams of heroin, and 211.4 grams of cocaine base. The two individuals present in the apartment, one Jonathan Banyan and an unnamed juvenile, were taken into custody. Serendipitously (at least for the police), though neither Thompson nor Dent were present at the time of the search, Thompson was detained that same day after police stopped her vehicle due to an expired registration sticker.

In an interview with police at Androscoggin County Jail in Auburn, Thompson fingered Wright as the individual who had "invested" in her and her boyfriend, Dent, paying for a separate apartment at 53 Shawmut Street in Lewiston, Maine, and arranging for the transportation of powder cocaine from New York to Maine, which they then "cooked" into cocaine base and sold out of the apartment. In that same interview, she explained that Wright would occasionally stay at their Shawmut Street apartment when he was in Maine, and that he also had at his disposal several places in New York where drugs were sold. In addition, Thompson said that she had made several trips back and forth between New York and Maine during which she transported drugs, and on one occasion, drove Dent and Wright from New York to Maine, while each of them were

carrying 100 grams of powder cocaine.  In her subsequent grand jury testimony, Thompson identified Banyan as a New York drug dealer that she knew as "Joe Blood," and when asked what he was doing in Maine, she testified that he was "kind of like a worker for Tanner [Wright]," and that "he was coming up here for support for Tanner."  She further testified that Wright recruited two individuals, "Rico" and "Dew" (Francis), to assist in the distribution of drugs out of various apartments operated by the conspiracy.

While Wright disputes this version of events and denies that he ever "invested" in anyone,[2] the police began to focus their investigative efforts on Wright.  These efforts ultimately led to properties at 172 and 174 Blake Street in Lewiston.  Although separate properties, the third- and fourth-floor apartments at 172 Blake Street were connected by an exterior walkway to the corresponding third- and fourth-floor apartments at 174 Blake Street, and the properties apparently were managed by the same company.  According to witness statements and an interview with the property manager, Wright rented the third-floor apartment at 174 Blake Street on November 10, 2014.  Following this initial rent payment, the landlord did not see Wright again, but accepted

---

[2] Wright spends a good deal of time in his brief attacking Thompson's credibility as a witness.  However, credibility determinations are best left for the district court, see United States v. González-Vélez, 587 F.3d 494, 504 (1st Cir. 2009).

a December rent payment for this same apartment from an individual that he later identified as Francis.[3]

On December 17, 2014, agents apprehended a woman exiting this same third-floor, 174 Blake Street apartment in possession of heroin. The woman informed the authorities that she had obtained the heroin from an individual that she knew as "Rocky" or "Rico." The next day, police received a tip from the property manager who had discovered firearms and what he believed to be narcotics in a vacant apartment on the fourth floor of 172 Blake Street.[4] Police arrived and discovered four firearms, ten ounces of cocaine base, personal effects, and an identification document belonging to Francis.[5] Subsequent forensic analysis revealed that Wright's fingerprints were on two separate bags containing drugs that were discovered in this apartment. The police also received the property manager's permission to search the vacant fourth-floor apartment across the walkway at 174 Blake Street, suspecting that drug traffickers were using other vacant apartments in the building

---

[3] Wright claims that an unnamed individual (he did not know who) paid him $600 in an arms-length transaction to rent the apartment, clean it, and then leave immediately.

[4] According to an interview with an individual who had been touring the property as a potential purchaser, the fourth-floor apartment at 172 Blake Street had been vacant since November 20 or 25, 2014.

[5] The parties stipulated that the identification document was actually found by the property manager after the agents had completed their search of the premises on December 18.

to store drugs. In that apartment, they discovered two backpacks: one containing personal effects and five ounces of heroin, and the other containing personal effects and $8,077.51 in cash.

On February 12, 2015, police received a tip from an informant that Wright was on his way from New York to Maine. Police also learned that Wright was staying at an apartment at 99 Horton Street in Lewiston. The police conducted surveillance of the house and observed several activities the police knew to be indicative of drug dealing. For instance, agents saw Randy Gosselin leave the apartment on several brief trips, sometimes entering the passenger seat of a vehicle and driving approximately 100 feet before getting out and then returning to the house. Additionally, authorities saw Willie Jackson leave the same residence, after which he made a drug sale to an individual that had previously provided credible information to law enforcement. That same cooperating witness then informed law enforcement that he had just purchased drugs from Jackson, and that "Tanner" (Wright's nickname) had returned to Maine and was selling drugs. Following information received from another informant that Wright and Francis were inside the residence at 99 Horton Street (from which the officers had just witnessed Jackson and Gosselin emerge to make several drug sales), officers executed a search warrant and arrested Wright, who was inside sleeping on an air mattress in the kitchen. Francis, who was seated at a chair next to a table

on which there was a digital scale and a box of sandwich baggies, was found in possession of 135 grams of cocaine base and 40 grams of heroin (with a combined street value of $30,000), while Wright had $200 in his pocket.

Wright ultimately pled guilty to possession with intent to distribute heroin and cocaine base, as well as conspiracy to distribute both substances. At sentencing, the district court found, over Wright's objection, that two enhancements applied. First, the court found that Wright held a leadership role in the conspiracy, because the government had shown by a preponderance of the evidence that the conspiracy involved "five or more participants" and that Wright had "recruit[ed] others" to come to Maine to participate in the scheme. This resulted in a three-level increase under U.S.S.G. § 3B1.1(b). Second, the district court applied a two-level increase for "possession of a dangerous weapon" under U.S.S.G. § 2D1.1(b)(1), attributing the four firearms discovered in the fourth-floor apartment at 172 Blake Street to Wright because the guns were discovered in close proximity to bags of drugs containing Wright's fingerprints and to an identification document belonging to a co-conspirator. Wright re-asserted his objections.

With a base offense level of thirty, the three-level role increase, the two-level firearm enhancement, and a three-level reduction for acceptance-of-responsibility, the district

court calculated Wright's total offense level as thirty-two. When paired with a criminal history category of I, Wright's Guidelines sentencing range ("GSR") was 121-151 months. The district court ultimately sentenced Wright to a downward variant sentence of 96 months' imprisonment. Wright filed a timely appeal.

## II. Discussion

### A. Standard of Review

In challenges to the procedural and substantive aspects of a criminal sentence, we employ a "multifaceted" abuse-of-discretion standard that "review[s] factual findings for clear error, arguments that the sentencing court erred in interpreting or applying the guidelines de novo, and judgment calls for abuse of discretion simpliciter." United States v. Serunjogi, 767 F.3d 132, 142 (1st Cir. 2014) (quoting United States v. Leahy, 668 F.3d 18, 21 (1st Cir. 2012)). Sentencing enhancements must be supported by a preponderance of the evidence. United States v. Burgos-Figueroa, 778 F.3d 319, 320 (1st Cir. 2015).

### B. Role-in-the-Offense Enhancement

Wright first argues that he was not a manager or supervisor of other individuals involved in the conspiracy, and that the district court's contrary finding was in error. We are not convinced. The three-level increase applies if a defendant "was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was

otherwise extensive." U.S.S.G. § 3B1.1(b). Here, as an initial matter, we discern no error in the district court's finding that the conspiracy in question involved five or more participants.

At a minimum, the government clearly proved that the conspiracy involved Wright, Dent, Thompson, Francis, Gosselin, and Jackson. Testimony from Thompson and other cooperating witnesses, as well as wiretapped phone conversations between Dent and Wright, showed that Wright and Dent were involved in drug trafficking, with Wright complaining on one call that he had invested nearly three thousand dollars to set up the drug dealing operation at one of the houses in the Auburn-Lewiston area and was irritated that he had not seen his share of profits. Additionally, police surveillance and testimony from cooperating witnesses both provided sufficient evidence that Jackson, Gosselin, and Francis were selling cocaine base out of the 99 Horton Street apartment on February 12, 2015, the day that Wright and his co-conspirators were arrested.

In his brief, Wright argues that the events in question made out two separate, distinct conspiracies. The first, he argues, involved himself, Dent and Thompson, but then a falling out between himself and Dent led the two to part ways, and thereafter he was involved in a second, distinct conspiracy with Francis and others at the time he was arrested on February 12, 2015. He also argues that he was merely a "drug retailer and a

supplier to others acting as free agents," and that he took no actions to direct the sales of drugs to customers.

However, as we have observed, "[w]hether a set of crimes can be attributed to one conspiracy is a question of fact, the resolution of which typically depends on evidence of common purpose, interdependence among the elements of the plan, and overlap among the participants." United States v. Monteiro, 417 F.3d 208, 212-13 (1st Cir. 2005) (internal citations omitted). Given the applicable standard of review for factual determinations made by the district court, we cannot conclude that the district court clearly erred in refusing to credit Wright's version of events. Wright's effort to bifurcate the criminal activities in this case into two separate conspiracies seems to be, in particular, "plucked out of thin air," with "nothing other than the appellant's ipse dixit" to support it. United States v. Demers, 842 F.3d 8, 13 (1st Cir. 2016). Furthermore, even if his version of events is a plausible one, we have held that "where there is more than one plausible view of the circumstances, the sentencing court's choice among supportable alternatives cannot be clearly erroneous." United States v. Dunston, 851 F.3d 91, 101-02 (1st Cir. 2017) (quoting United States v. Ruiz, 905 F.2d 499, 508 (1st Cir. 1990)).

The district court's finding that Wright exercised a managerial or supervisory role over others involved in the

conspiracy is also supported by the record. Intercepted phone calls between Wright and Dent confirm that Wright had invested money up front for other conspirators to have an apartment out of which to operate, and to have drugs to sell. According to Thompson, when she and Dent were homeless, Wright offered to pay for their apartment in Maine and financed the initial purchase of 200 grams of cocaine to get the operation moving.[6] See United States v. Savarese, 686 F.3d 1, 20 (1st Cir. 2012) (noting that the recruitment of others into the conspiracy can suffice to establish that a defendant exercised a "managerial" function). Additionally, the strong evidence that Wright rented the third-floor, 174 Blake Street apartment for use as a drug sale point suggests that he was acting in a managerial role, helping to finance and make arrangements for the continued operation and prosperity of the criminal enterprise. See United States v. Ahrendt, 560 F.3d 69, 77 (1st Cir. 2009) (concluding that the defendant had "some authority within the conspiracy in that he rented the apartment where drugs were processed, packaged and sold").

---

[6] We note that district courts are well within their rights to consider third-party proffer statements (like Thompson's in this case) for sentencing purposes, see United States v. Díaz-Arias, 717 F.3d 1, 26-27 (1st Cir. 2013) (concluding that use of third-party proffer statements at sentencing is appropriate).

Furthermore, though Wright argues that Dent was above him in the pecking order and that he "wasn't the boss of anyone," surveillance of the house at 99 Horton Street on February 12, 2015, and testimony from both Gosselin and from other sources of information who procured drugs that day show that Gosselin and Jackson were making hand-to-hand drug transactions at Wright's behest, and the enhancement applies when "the defendant 'exercised control over, organized, or was otherwise responsible for superintending the activities of' at least one other participant in a criminal activity on at least one occasion." United States v. Ofray-Campos, 534 F.3d 1, 40 (1st Cir. 2008) (quoting United States v. García-Morales, 382 F.3d 12, 19 (1st Cir. 2004)); see also United States v. Casas, 356 F.3d 104, 129 (1st Cir. 2004) (noting that "the mere fact that" the defendant "was subordinate to" another conspirator "does not establish, without more, that [he] was not an organizer or leader of the conspiracy"), order clarified sub nom. United States v. Cunningham, 359 F.3d 627 (1st Cir. 2004).

In short, we find no error, clear or otherwise, in the district court's finding that the conspiracy consisted of five or more participants and that Wright was a "manager or supervisor" for purposes of the role enhancement.

C. Firearm Enhancement

Wright also challenges the district court's application of a two-level enhancement for the use or possession of a firearm in the commission of the offense, which the court applied as a result of the four firearms found in the fourth-floor apartment at 172 Blake Street. He argues that he was not aware of any firearms being used by any other members of the conspiracy, and that he left Maine on November 10, 2014, after cleaning the third-floor apartment at 174 Blake Street, and only returned on February 12, 2015, the day he was arrested. Because he was not present during the window of time when the guns would have been placed in the vacant apartment, and because "the government put forth no evidence establishing specifically who stashed the guns and drugs at 172 Blake Street," Wright argues that they cannot be attributed to him for purposes of the sentencing enhancement.

The problem with Wright's argument is that in conspiracy cases, the government need not show that the defendant himself possessed or was even aware of the existence of the weapon; rather "it just must be reasonably foreseeable that a co-conspirator would possess a weapon in furtherance of the criminal activity." United States v. Miranda-Martinez, 790 F.3d 270, 276 (1st Cir. 2015) (quoting United States v. Greig, 717 F.3d 212, 219 (1st Cir. 2013)), cert. denied 136 S. Ct. 430 (2015). We find that this test is satisfied in the instant case, particularly when our review

of the district court's factual finding in this respect is for clear error. See id. (reviewing for clear error the district court's finding that it was "foreseeable that dangerous weapons, including firearms, would be possessed during the drug trafficking conspiracy").

The district court's finding that the conspiracy was using several vacant apartments in the same property (which are connected by external walkways) to store guns and drugs during the operative period of time is supported by a preponderance of the evidence. The relevant inquiry, therefore, is not whether Wright himself possessed the firearms in question or knew that they were in the apartment at 172 Blake Street; rather, the question is whether it would be "reasonably foreseeable" to Wright that one of his co-conspirators would procure and store firearms in furtherance of the criminal conspiracy, namely, to protect the drugs against potential robberies or rival crews or for intimidation against individuals owing money to the conspirators.

Our cases have regularly allowed for this type of inference in situations where weapons are discovered in close proximity to drugs. See, e.g., Miranda-Martinez, 790 F.3d at 276 (noting that "we have often observed that 'firearms are common tools' in drug trafficking conspiracies involving large amounts of drugs such as the two in which [the defendant] admits he participated" (quoting United States v. Bianco, 922 F.2d 910, 912

(1st Cir. 1991))); United States v. Corcimiglia, 967 F.2d 724, 727 (1st Cir. 1992) (observing that the court "has recognized that the mere presence of a firearm in the same residence which is used as a site for drug transactions may allow a sentencing court to make the inference that the weapon was present for the protection of the drug operation").  We have no difficulty applying this principle to the case at hand.

Since the government established that at least one co-conspirator "possessed a weapon during the offense," Wright can only avoid application of the sentencing enhancement if he can show that "it is clearly improbable that the [firearms]" possessed were "connected to the drug conspiracies." Miranda-Martinez, 790 F.3d at 276 (quoting U.S.S.G. § 2D1.1, cmt. 11).  Wright has not made such a showing, and we therefore affirm the application of the firearms enhancement.

D. Substantive Reasonableness

Finally, we address and dispose of Wright's argument that his sentence is substantively unreasonable.  Wright's only contention on this point is that the district court sentenced him to a term of imprisonment that was twenty percent below the low-end of the calculated GSR (a 96 month sentence rather than the lower-end range of 121 months), but that this GSR calculation was erroneous becuase the two sentencing enhancements discussed above were improperly applied.  Had those enhancements not been applied,

Wright argues, his ultimate sentence of 96 months would have been in excess of the properly-calculated GSR range, and would thus be unreasonable. However, since we have already concluded that the enhancements were properly applied, and since Wright offers no other argument for the proposition that his below-guidelines sentence is substantively unreasonable, we reject this challenge.

### III. Conclusion

For the aforementioned reasons, we find no error in the district court's sentencing decision and we **AFFIRM.**