# United States Court of Appeals
## For the First Circuit

No. 09-1178

UNITED STATES OF AMERICA

Appellee,

v.

ANTHONY MATOS

Defendant, Appellant,

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Torruella, Circuit Judge,
Souter, Associate Justice,[*]
and Stahl, Circuit Judge.

Edward J. O'Brien, by Appointment of the Court, for appellant.
Mark T. Quinlivan, Assistant U.S. Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief for appellee.

July 7, 2010

[*]The Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**STAHL**, **Circuit Judge**.  The United States District Court, District of Massachusetts sentenced Defendant Anthony Matos to 84 months' imprisonment and four years' supervised release for three counts of wire fraud and one count of conspiracy to launder money on October 16, 2006.  Matos challenges his sentence in four respects.  First, he argues that his sentence on the wire fraud counts was illegal because he was sentenced to a term higher than the statutory maximum for those counts.  Next, he contends that his sentence should be vacated and remanded for resentencing in light of (1) Amendment 709 to the Sentencing Guidelines (adopted after Matos was sentenced), which restated the rules for determining when multiple prior sentences should be counted as one for criminal history purposes when imposed on the same day; and (2) error committed by the district court in attributing criminal history points to certain of his prior sentences that he claims were excludable under the law.  Finally, Matos challenges the restitution order imposed by the court on the grounds that it derived from dismissed counts and that it may have incorrectly included amounts recovered by the victims.

As the government concedes, the district court erred in imposing a term of four years of supervised release on Matos, and therefore we vacate this term of supervised release and remand to the district court to impose a term of supervised release of no more than three years.  Otherwise, we affirm Matos's sentence.

# I. Facts and Background[1]

From approximately 1995 through May 2002, a number of individuals in the Springfield, Massachusetts area conspired to participate in a land-flipping scheme. Several individuals, including Matos, purchased distressed properties typically located in low-income neighborhoods and then sold them at a much higher price to home buyers, many of whom did not have the financial strength to qualify for loans. Matos and others worked with mortgage brokers and real estate appraisers to obtain mortgage loans for these otherwise unqualified home buyers by submitting false loan documentation and inflated appraisals to various lending institutions. Albert Innarelli, a real estate attorney and co-conspirator, generated false closing documents to facilitate and conceal the fraud. The conspirators shared in the loan proceeds they obtained from various lending institutions at the closings of the flipped properties.

Ultimately, as one might expect, many of the buyers were unable to pay their mortgage loans and defaulted.

On September 21, 2005, a federal grand jury returned a sixty-nine count superseding indictment charging Matos and other co-defendants with wire fraud, in violation of 18 U.S.C. § 1343

---

[1]As Matos was sentenced following a guilty plea, "[w]e distill the facts from the plea colloquy, the undisputed portions of the presentence investigation report . . . and the transcript of the disposition hearing." United States v. Innarelli, 524 F.3d 286, 288 (1st Cir. 2008) (citations and internal quotations omitted).

(Counts 1 through 68), and conspiracy to launder money, in violation of 18 U.S.C. §§ 1956(h) and 1957 (Count 69). On May 4, 2006, Matos pleaded guilty to Counts 12, 52, 65, and 69 of the superseding indictment, and the remaining counts against him were dismissed.

At Matos's sentencing on October 16, 2006, the court assessed fifteen criminal history points, which under the Sentencing Guidelines ("Guidelines") equated to a Criminal History Category of VI.[2] Matos objected to his Criminal History Category, arguing that it overstated the seriousness of his criminal history and that he "should be entitled to a departure pursuant to U.S.S.G. 4A1(3)(b) [sic]."[3] Finally, the district court calculated Matos's Total Offense Level to be 22, and with a Criminal History Category

---

[2]Matos was sentenced under the 2001 Guidelines. Under the 2001 Guidelines (as well as the current version), a defendant with thirteen or more criminal history points is assigned a Criminal History Category of VI.

[3]Though imprecisely cited in his written objections to the Presentence Report (Dkt. No. 272), we assume that Matos was referring to U.S.S.G. § 4A1.3, which states, in relevant part:
> There may be cases where the court concludes that a defendant's criminal history category significantly over-represents the seriousness of a defendant's criminal history or the likelihood that the defendant will commit further crimes. . . . The court may conclude that the defendant's criminal history was significantly less serious than that of most defendants in the same criminal history category . . ., and therefore consider a downward departure from the guidelines.

U.S.S.G. § 4A1.3 (2001).

of VI, the result was an advisory Guidelines range of 84-105 months.

The district court sentenced Matos to 84 months' imprisonment on each count, to be served concurrently, to be followed by forty-eight months of supervised release on each count, also to be served concurrently.  Matos was also ordered to pay restitution in the amount of $350,000 to Equicredit Corporation (now Bank of America), and $8,331 to Onell Agueda.

## II. Discussion

### A. Legality of Sentencing Above the Relevant Statutory Maximum for the Wire Fraud Counts

**1.**

Matos first argues that his concurrent sentences of 84 months' imprisonment and four years of supervised release on the wire fraud counts should be vacated because the superseding indictment did not allege that the violations affected financial institutions, and therefore he should have been subjected only to a statutory maximum of five years' imprisonment and three years of supervised release on each of those counts.

The Presentence Report ("PSR") stated that Matos was subject to a statutory maximum term of imprisonment of thirty years on each of the wire fraud counts and ten years on the money laundering conspiracy.  The PSR also provided that Matos was subject to a statutory maximum term of supervised release of five years on the wire fraud counts and three years on the money

-5-

laundering conspiracy count.[4]  Matos did not object to either of

those calculations, nor did he object to his sentence of 84 months'

imprisonment and four years of supervised release on the ground

that it exceeded the relevant statutory maximums.

Because Matos did not argue below that he was subject to

a statutory maximum term of five years' imprisonment on the wire

fraud counts, we review only for plain error.  United States v.

Hilario-Hilario, 529 F.3d 65, 76 (1st Cir. 2008).  To prevail under

this standard, Matos "bears the heavy burden of showing (1) that an

error occurred; (2) that the error was clear or obvious; (3) that

the error affected his substantial rights; and (4) that the error

also seriously impaired the fairness, integrity, or public

reputation of judicial proceedings."  United States v. Riccio, 529

F.3d 40, 46 (1st Cir. 2008) (citations omitted).  This is a burden

which he cannot meet.

Matos contends that his sentence of 84 months'

imprisonment on the wire fraud counts was illegal because the

--------------------------------------------------------------------

[4]In fact, the PSR set forth two different maximum terms of
supervised release on the wire fraud counts.  At one point, it
listed the wire fraud counts as Class B felonies and determined
that, under 18 U.S.C. § 3583(b), the Court could impose a term of
supervised release of not more than five years on those counts.
However, when describing the plea agreement, the PSR stated that
Matos and the government had agreed that the maximum term of
supervised release Matos was facing on the wire fraud counts was
three years.  We need not address any impropriety in this
discrepancy as we conclude, in any event, that the court committed
plain error in sentencing Matos to a term of supervised release
above three years.

superseding indictment did not allege that his wire fraud offenses affected "financial institutions," as required by <u>Jones</u> v. <u>United States</u>, 526 U.S. 227 (1999), and that the correct statutory maximum for those crimes therefore was only five years, not thirty years. While Matos is correct that the superseding indictment did not allege that his wire fraud offenses affected financial institutions, he cannot establish that his concurrent sentences of 84 months constitute plain error.

At the time of the fraud in Matos's case, a wire fraud conviction invoked a maximum term of imprisonment of five years, unless the fraud affected a financial institution, in which case the statutory maximum was thirty years' imprisonment. <u>See</u> 18 U.S.C. § 1343 (2001).[5] The government concedes that the aggravating circumstance for this offense -- whether the crime "affects a financial institution" -- constitutes an offense element that must be alleged in the indictment and either admitted by the defendant or proven to a jury beyond a reasonable doubt. <u>See</u> <u>United States</u> v. <u>Ubakanma</u>, 215 F.3d 421, 426 (4th Cir. 2000). The

---

[5]18 U.S.C. § 1343 provided, at the time of the offense: Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

government further concedes that the superseding indictment alleged that Matos and his co-conspirators "devised a scheme and artifice to defraud and obtain money from various <u>lending institutions</u>" and that the term "lending institution," at least on its face, does not fall within the statutory definition of "financial institution" in place at the time of the offenses of conviction.  <u>See</u> 18 U.S.C. § 20 (2001).[6]

Matos therefore may be able to show that in sentencing him in accordance with an aggravating element that was not charged in the indictment, the district court committed error which was

---

[6]The definition of "financial institution" was as follows:
As used in this title, the term "financial institution" means --
(1) an insured depository institution (as defined in section 3(c)(2) of the Federal Deposit Insurance Act);
(2) a credit union with accounts insured by the National Credit Union Share Insurance Fund;
(3) a Federal home loan bank or a member, as defined in section 2 of the Federal Home Loan Bank Act (12 U.S.C. 1422), of the Federal home loan bank system;
(4) a System institution of the Farm Credit System, as defined in section 5.35(3) of the Farm Credit Act of 1971;
(5) a small business investment company, as defined in section 103 of the Small Business Investment Act of 1958 (15 U.S.C. 662);
(6) a depository institution holding company (as defined in section 3(w)(1) of the Federal Deposit Insurance Act [<u>sic</u>];
(7) a Federal Reserve bank or a member bank of the Federal Reserve System;
(8) an organization operating under section 25 or section 25(a) of the Federal Reserve Act; or
(9) a branch or agency of a foreign bank (as such terms are defined in paragraphs (1) and (3) of section 1(b) of the International Banking Act of 1978).

"clear or obvious"; however, he cannot show that his substantial rights were affected by that error. Matos's 84-month sentences on the wire fraud counts were concurrent with the identical 84-month sentence on the money laundering count, which was within the ten-year statutory maximum for a violation of the federal money laundering statute. See 18 U.S.C. § 1957 (2001). Any error, therefore, was harmless, as we have held in similar circumstances. See, e.g., United States v. Ziskind, 471 F.3d 266, 271 (1st Cir. 2006) (defendant who argued that his 18-month sentence exceeded the authorized statutory maximum was not prejudiced because that sentence ran concurrent with a 235-month sentence imposed on the same day on an unrelated felon-in-possession charge); cf. United States v. Marino, 277 F.3d 11, 38 n.10 (1st Cir. 2002) (rejecting an argument not raised by defendant that "[it] matter[ed] not" to defendant's term of incarceration that defendant was sentenced to 360 months' imprisonment on two counts when the statutory maximum for those counts was 240 months because defendant's equivalent sentence of 360 months on a third count, imposed concurrently, was appropriate); see also United States v. Ellis, 326 F.3d 593, 599-600 (4th Cir. 2003) (concluding, under plain error review, that sentence in excess of statutory maximum authorized for one count did not affect substantial rights where defendant received valid equal or longer concurrent sentences on other counts).

While we acknowledge Matos's argument that "the District Court's misunderstanding of the applicable statutory maximum may have contributed to the length of the sentence the Court impose[d] and to the Court's refusal to depart downward from the guideline sentence," we find it to be unpersuasive. The district court made clear at sentencing that the sentence of 84 months was being guided not by the applicable statutory maximums, but rather by balancing the 18 U.S.C. § 3553(a) factors and taking the advisory Guidelines range of 84-105 months into account. The court noted that Matos's "very substantial criminal history category" increased his sentence over the general level of that of his co-defendants. In explaining the sentence imposed, the court explicitly stated that "my decision has to be guided by the context of the advisory guidelines, the considerations set forth in 3553(a) and under those circumstances, I think that the 84 month sentence is the appropriate sentence here."[7]

Additionally, while we are not unmindful of <u>United States</u> v. <u>Klopf</u>, 423 F.3d 1228 (11th Cir. 2005), which defendant cites for the proposition that when one sentence of a multiple-count

---

[7]The section 3553(a) factors which courts are required to consider include "the nature and circumstances of the offense"; "the history and characteristics of the defendant"; "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; and "the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . ." 18 U.S.C. § 3553(a).

"sentencing scheme" is illegal (here, the wire fraud sentences), the "scheme is disrupted . . . [and] it is appropriate that the entire case be remanded for resentencing," id. at 1245 (citations omitted), we are not persuaded. We note that Klopf was decided on the basis of "established precedent" in the Eleventh Circuit that "vacating the sentence for one count disrupts the sentencing package and requires resentencing for all counts of conviction." Id. at 1246. We are bound by no such precedent here.

Though we find that Matos has not met the plain error standard with regard to his sentence of imprisonment, the district court's imposition of a term of four years of supervised release was, in fact, plain error, as the government concedes. As the statutory maximum for the wire fraud counts was five years, inasmuch as the superseding indictment did not allege that the offenses affected a financial institution, those crimes constitute Class D felonies under 18 U.S.C. § 3559(a)(4) that are subject to a maximum term of supervised release of not more than three years under 18 U.S.C. § 3583(b)(2). Matos's money laundering conspiracy conviction constitutes a Class C felony under Section 3559(a)(3) that is also subject to a maximum term of supervised release of not more than three years under Section 3583(b)(2).

Consequently, as the maximum term of supervised release for Matos's crimes was three years, we find that Matos's term of supervised release should be vacated and remanded for the sole

purpose of the imposition of a new term of supervised release on all counts that does not exceed three years.  See Ziskind, 471 F.3d at 271-72.

**2.**

In his reply brief, Matos asks us for the first time to review the propriety of his money laundering conviction in light of the Supreme Court's decision in United States v. Santos, 553 U.S. 507, 128 S.Ct. 2020 (2008).  Matos claims that he committed no violation of the money laundering statute, as construed by Santos, because he engaged in no monetary transaction involving "proceeds" obtained from a criminal offense (his wire fraud offenses).  See 18 U.S.C. §§ 1957(a), 1957(f)(2), and 1957(f)(3).

On a routine basis, we do not consider claims which are raised for the first time in a reply brief, see, e.g., Esso Standard Oil Co. (Puerto Rico) v. Rodriguez-Perez, 455 F.3d 1, 6 (1st Cir. 2006), and in any event, it is hardly certain that the Santos holding would have any application here.  We thus decline to address the merits of Matos's argument.

**B. Grouping of Certain of Matos's Prior Sentences for Criminal History Purposes**

We next address Matos's claim that his sentence should be vacated and remanded so that the district court might consider whether five of his prior convictions should be grouped under Amendment 709 to the Guidelines, which has restated the rules for

-12-

determining when multiple crimes are to be counted as one for criminal history purposes.

As Matos did not argue below that the offenses at issue should be consolidated, pursuant to Amendment 709 or otherwise, we apply plain error review.[8] See United States v. Ahrendt, 560 F.3d 69, 76 (1st Cir. 2009).

Matos's argument concerns five prior convictions for which he was sentenced on February 8, 1995, and for which, collectively, the Probation Office assigned him eleven criminal history points.[9] Amendment 709 to the Guidelines, adopted in 2007 after Matos was sentenced, states, in relevant part:

> Prior sentences always are counted separately if the sentences were imposed for offenses that were separated by an intervening arrest (i.e., the defendant is arrested for the first offense prior to committing the second offense). If there is no intervening arrest, prior sentences are counted separately unless (A) the sentences resulted from offenses contained in the same charging instrument; or (B) the sentences were imposed on the same day. Count any prior sentence covered by (A) or (B) as a single sentence.

U.S.S.G. § 4A1.2(a)(2)(2009). Matos argues that if the revised Guidelines had been in effect at the time of his sentencing, the

---

[8]We note that we have twice vacated and remanded a defendant's sentence for reconsideration in light of Amendment 709 even in the absence of plain error. See Ahrendt, 560 F.3d at 80; United States v. Godin, 522 F.3d 133, 136 (1st Cir. 2008) (per curiam). However, as we will discuss at greater length below, those cases are distinguishable on their facts.

[9]In fact, it appears from the PSR that Matos was sentenced for six offenses on February 8, 1995. We will refer here only to those five which Matos discusses in his brief.

five offenses for which he was sentenced on February 8, 1995, would have been deemed to have been one prior sentence for criminal history purposes because he was sentenced for all five on the same day without, he claims, an intervening arrest. Therefore, he argues, we should remand to the district court for resentencing consistent with our decisions in United States v. Ahrendt, 560 F.3d 69 (1st Cir. 2009), and United States v. Godin, 522 F.3d 133 (1st Cir. 2008) (per curiam), so that the district court might "consider the [Sentencing] Commission's current thinking for whatever use it may be in exercising the court's judgment about the proper sentence." Godin, 522 F.3d at 136. We find that Ahrendt and Godin are distinguishable and that remand for resentencing in consideration of Amendment 709 is not appropriate in this case.

In both Ahrendt and Godin, it was evident that if the Guidelines as amended in 2007 had been in effect at the time of the defendant's sentencing, the offenses at issue would have been counted as one. See Ahrendt, 560 F.3d at 79; Godin, 522 F.3d at 134. In this case, that point is far from clear. The Guidelines as revised by Amendment 709 explicitly state that prior sentences always are counted separately if they were imposed for offenses that were separated by an intervening arrest. In this case, the PSR indicates that an arrest followed one of the five February 8, 1995, offenses which Matos discusses, the last offense in

-14-

chronological order, and is silent as to whether Matos was arrested for the other four.[10]

In both Ahrendt and Godin, we vacated and remanded not because some error, plain or otherwise, by the district court required it, but because we thought it "prudent to allow the [district] court the opportunity to consider the Sentencing Commission's updated views" in light of Amendment 709. See Ahrendt, 560 F.3d at 80. Under the facts of this case, we do not consider that exercise to be a prudent one.

Were we to vacate and remand to provide the district court an opportunity to reconsider Matos's sentence in light of Amendment 709, the court would first be required to engage in fact-finding to determine whether the Amendment applies to Matos, by

---

[10]The first of the offenses for which Matos was sentenced on February 8, 1995, was violation of probation on a 1993 conviction for assault by dangerous weapon (four counts) and malicious destruction of property. For violating his probation, Matos was sentenced to twenty-two months' imprisonment. The other four offenses which Matos cites were committed over a period of nearly 30 months preceding February 8, 1995. (1) Operating a motor vehicle after a suspended license and attaching wrong motor vehicle plates (92-8451). According to the PSR, the offenses occurred on July 30, 1992, and Matos was arraigned on December 11, 1992. (2) Operating a motor vehicle after a suspended license (94-8123). The PSR indicates that the offense occurred on July 8, 1994, and that Matos was arraigned on September 15, 1994. (3) An assault and battery (94-11982) committed on October 22, 1994, for which Matos was arraigned on October 24, 1994. (4) Operating a motor vehicle after a revoked license and operating a motor vehicle to endanger lives and safety (94-12364). The PSR states that the offenses occurred on November 1, 1994, and that Matos "was placed under arrest by officers from the Massachusetts State Police after their arrival on the scene." Matos was arraigned the following day, November 2, 1994.

determining whether the offenses for which he was sentenced on February 8, 1995, were not, in fact, separated by intervening arrests. Ultimately, it is highly unlikely that Amendment 709 would apply, as the timing of the offenses and arraignments indicates that the offenses were almost certainly separated by intervening arrests. While it is theoretically possible that Matos was arraigned for the four crimes as to which there is no arrest information in the PSR pursuant to summonses rather than arrests,[11] see Mass. R. Crim. P. 6(a)(1), Matos has offered no evidence to support that conclusion.

We conclude that Godin and Ahrendt do not advocate in favor of remanding for resentencing in light of Amendment 709, and so we elect not to do so.

## C. Inclusion of Certain of Matos's Prior Sentences for Criminal History Purposes

Next, Matos argues that the district court erred in calculating his criminal history by assigning criminal history points to three of his prior convictions: operating after a suspended license and attaching wrong motor vehicle plates; receiving stolen property; and larceny by check. We disagree.

---

[11]We have previously noted, without deciding the issue, that treating an intervening summons as the functional equivalent of an intervening arrest for the purposes of U.S.S.G. § 4A1.2 seems problematic. United States v. Correa, 114 F.3d 314, 316 n.3 (1st Cir. 1997). We acknowledge the same concern here but, again, do not reach the issue.

Though we would typically review the district court's interpretation and application of the Guidelines de novo, United States v. Stoupis, 530 F.3d 82, 84 (1st Cir. 2008), Matos did not raise this argument below, and so we review only for plain error. United States v. Vasco, 564 F.3d 12, 22 (1st Cir. 2009). Matos did object more generally to his criminal history category, arguing that it "overstate[d] the seriousness" of his criminal history and that he should be "entitled to a departure pursuant to U.S.S.G. 4A1(3)(b) [sic]." Matos complained that he had "received 7 Criminal History Points for a combination of State misdemeanor, and motor vehicle offenses, occurring more than 10 years ago." He also noted that "[t]he receiving stolen property charge concerned a license plate; the larceny charge was a state misdemeanor, involving less than $200.00; in each case a nominal fine was imposed."

The district court correctly construed Matos's objection as a motion for downward departure. Section 4A1.3, which Matos cited in his objection, addresses departures from the Guidelines range, including downward departures, when a defendant's criminal history category "significantly over-represents the seriousness of a defendant's criminal history." U.S.S.G. § 4A1.3 (2001). At sentencing, Matos's counsel expressed concern that seven of Matos's criminal history points "had to do with what is characterized as traffic offenses, and the others are two state misdemeanors for

-17-

which he received either a fine, disposition and an order of restitution." Counsel concluded that portion of his argument to the court by saying, "I think there should be a departure basis on the appropriate section of the guidelines. It does permit a Court to depart if it finds that the criminal history is overrepresented." Matos did not argue, as he does now, that certain of his prior sentences should have been completely excluded under the Guidelines. Consequently, we review the district court's criminal history calculation only for plain error.

**1.**

Matos first argues that it was error to include in his criminal history his prior sentence of operating a motor vehicle after a suspended license and attaching wrong motor vehicle plates because he received a sentence of only ten days' imprisonment, which was suspended, and a term of probation of only 90 days.

U.S.S.G. § 4A1.2(c) states that misdemeanor and petty offenses are counted towards a defendant's criminal history, but it excludes a group of enumerated offenses (and offenses "similar to them") unless the sentence for the offense was a term of probation of at least one year or a term of imprisonment of at least thirty days, or the offense was similar to an instant offense. U.S.S.G. § 4A1.2(c) (2001). If a misdemeanor offense is not "similar to" one of the enumerated offenses, then it is counted regardless of the length of the sentence imposed.

Here, Matos's conviction for operating a motor vehicle after suspended license is clearly "similar to" the offense of "[d]riving without a license or with a revoked or suspended license" enumerated in Section 4A1.2(c)(1). U.S.S.G. § 4A1.2(c)(1) (2001). However, Matos was also convicted of attaching wrong motor vehicle plates. We find that the district court did not commit plain error in implicitly concluding that this offense was not "similar to" any of the Section 4A1.2(c)(1) offenses and assigning it one criminal history point. Cf. United States v. Caputo, 978 F.2d 972, 977-78 (7th Cir. 1992) (holding that the offense of using a false driver's license is "categorically more serious" and thus not similar to the 4A1.2(c)(1) offenses of "driving without a license or with a revoked or suspended license" and giving "false information to a police officer"); United States v. Guajardo, 218 Fed. Appx. 294, 297-98, 2007 WL 579914, at **2-3 (5th Cir. Feb. 12, 2007) (concluding that the offense of displaying a counterfeit inspection sticker was not similar to the offense of "driving without a license or with a revoked or suspended license"). We reach no conclusion as to whether the offense of attaching wrong motor vehicle plates is, in fact, similar to the Section 4A1.2(c)(1) offenses of "driving without a license or with a revoked or suspended license" or providing "false information to a police officer," as Matos argues, but merely conclude that the district court did not plainly err in finding that the offenses

were not similar and counting the attaching wrong motor vehicle plates offense toward Matos's criminal history.

## 2.

Matos also received one criminal history point for the offense of knowingly receiving stolen property, for which he was fined $100, and one point for the offense of larceny by check, for which he was fined $300. Matos argues that because these convictions resulted only in a fine, they should not have been included in his criminal history score.[12]

---

[12]We disagree with Matos's general proposition that a prior conviction resulting only in a fine cannot count toward a defendant's criminal history. Matos relies on U.S.S.G. § 4A1.1, Application Note 4, which states that a sentence to pay a fine does not, by itself, count as a "criminal justice sentence." U.S.S.G. § 4A1.1, Application Note 4 (2001). But that Guideline, by its terms, is limited to the definition of what constitutes a "criminal justice sentence" for purposes of a two-point enhancement under Section 4A1.1(d), and does not support Matos's assertion that any sentence resulting only in a fine does not count for criminal history purposes.

Our decision in United States v. Castro, 279 F.3d 30 (1st Cir. 2002), on which Matos also relies, similarly does not support his position. In that case, we noted that a prior offense "similar to" one of the offenses enumerated at Section 4A1.2(c)(1) of the Guidelines (specifically, "[d]isorderly conduct or disturbing the peace") was properly counted if, pursuant to the terms of the Guideline, "the sentence was a term of probation of at least one year." Castro, 279 F.3d at 35. We stated that "[t]he 'at least one year' requirement imposed by the guidelines, U.S.S.G. § 4A1.2(c)(1)(A), reflects a plausible determination that disorderly conduct convictions resulting in at least one year of probation are the type of convictions that are sufficiently serious to be included in one's criminal history, while such convictions, should they result only in a fine, are not." Id. Our reasoning in Castro applies to those offenses which are similar to those enumerated at Section 4A1.2(c)(1), but as Matos's convictions for receiving stolen property and larceny by check are not such offenses, Castro is inapposite.

-20-

First, as to Matos's conviction for receiving stolen property, it is not clear from the record whether the district court counted the offense as a felony or as a misdemeanor, but under either classification, the court did not commit error. The Guidelines provide that "[s]entences for all felony offenses are counted." U.S.S.G. § 4A1.2(c) (2001). A "felony offense" is defined as "any federal, state, or local offense <u>punishable</u> by death or a term of imprisonment exceeding one year, regardless of the actual sentence imposed." U.S.S.G. § 4A1.2(o) (2001). Under Massachusetts law, the crime of receipt of stolen goods is punishable for a first offense (if the value of the goods does not exceed $250, as the PSR states it did not in this case) by imprisonment of up to two and one-half years. <u>See</u> Mass. Gen. Laws ch. 266, § 60 (2000). Thus, it would have been proper for the district court to count Matos's prior conviction for receiving stolen property as a felony offense under the Guidelines because it is punishable by a term of imprisonment exceeding one year. <u>See</u> <u>United States</u> v. <u>Almenas</u>, 553 F.3d 27, 31-32 (1st Cir. 2009) (finding that district court correctly determined that defendant's resisting arrest conviction was a "felony offense" under § 4A1.2(c) because it carried a punishment of up to two and one-half years' imprisonment under Massachusetts law, and thus was "punishable by . . . a term of imprisonment exceeding one year").

-21-

Even if the district court determined that receiving stolen property is a misdemeanor and not a felony offense under the Guidelines, it still was not error for the district court to count it. "Sentences for misdemeanor and petty offenses" are counted if they are not "similar to" the offenses enumerated in Section 4A1.2(c)(1), and receiving stolen property is not similar to any of the offenses listed therein.[13]

Finally, the district court did not plainly err, in counting Matos's conviction for larceny by check. Matos argues that this offense is similar to the offense of "[i]nsufficient funds check" enumerated in Section 4A1.2(c)(1), and thus should not be counted because the sentence was only a fine rather than "a term of probation of at least one year or a term of imprisonment of at least thirty days" as required by Section 4A1.2(c)(1)(A). U.S.S.G. § 4A1.2(c)(1)(A) (2001).

---

[13]The following offenses are listed:
Careless or reckless driving[;] [c]ontempt of court[;] [d]isorderly conduct or disturbing the peace[;] [d]riving without a license or with a revoked or suspended license[;] [f]alse information to a police officer[;] [f]ish and game violations[;] [g]ambling[;] [h]indering or failure to obey a police officer[;] [i]nsufficient funds check[;] [l]eaving the scene of an accident[;] [l]ocal ordinance violations (excluding local ordinance violations that are also criminal offenses under state law)[;] [n]on-support[;] [p]rostitution[;] [r]esisting arrest[;] [t]respassing.

U.S.S.G. § 4A1.2(c) (2001).

The district court committed no "clear or obvious" error in implicitly finding that Matos's offense was not similar to that of "[i]nsufficient funds check." The commentary to Section 4A1.2 states that "'[i]nsufficient funds check,' as used in § 4A1.2(c)(1), does not include any conviction establishing that the defendant used a false name or non-existent account." U.S.S.G. § 4A1.2, Application Note 13 (2001). The PSR states that according to court records, Matos wrote a check on a closed account to the Ames Department store in the amount of $178. As other circuits have reasoned, "[a] closed account is a nonexistent account and distinguishable from an open account having insufficient funds on deposit to cover a check when presented for payment." United States v. Wilson, 980 F.2d 259, 262-63 (4th Cir. 1992); see also United States v. McClain, 176 F.3d 486 (Table), 1999 WL 282446, at *1 (9th Cir. Apr. 15, 1999) (mem.) (equating a closed account with a non-existent account for purposes of § 4A1.2, Application Note 13). Thus, the district court did not commit plain error in counting Matos's conviction for larceny by check, when the account on which the check was written was a closed account.

## D. Restitution

Finally, Matos argues that the restitution orders to Onell Agueda and Equicredit Corporation should be vacated. Matos objected to restitution at sentencing, but only on the ground that the Mandatory Victims Restitution Act ("MVRA") permits restitution

to individuals, but not to corporations. He did not object to the restitution order as to Agueda, nor did he argue, as he does here, that the district court incorrectly calculated the loss amount as to Equicredit Corporation. Therefore, we again review only for plain error. See United States v. Theodore, 354 F.3d 1, 8 (1st Cir. 2003). The restitution order itself we review for abuse of discretion and subsidiary factual findings for clear error. Id.

## 1. Restitution to Onell Agueda

Matos argues that the record does not show that he committed an offense against Agueda, and thus the district court's order that he pay Agueda restitution should be vacated. We disagree.

Matos claims that because he is not listed in the PSR as being involved in the sale 22 Burr Street, the property purchased by Agueda, or in the distribution of the sale proceeds of the property, the district court's order of restitution is not substantiated by the record. While Matos was listed in the superseding indictment as having been involved in the sale of 22 Burr Street, he notes that the relevant count (Count 57) was dismissed as part of his plea agreement.

However, pursuant to the MVRA, 18 U.S.C. § 3663A, where the defendant's criminal conduct includes "an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity," a victim is defined as "any person directly harmed by

-24-

the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2) (2008); see United States v. Acosta, 303 F.3d 78, 86 (1st Cir. 2002) (same, interpreting identical provision in the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. § 3663). "In such cases, the district court may order restitution without regard to whether the conduct that harmed the victim was conduct underlying the offense of conviction." Acosta, 303 F.3d at 86-87.

As we explained in United States v. Hensley, 91 F.3d 274 (1st Cir. 1996), when interpreting the identical provision in the VWPA:

> [T]he district court may order restitution to every victim directly harmed by the defendant's conduct "in the course of the scheme, conspiracy, or pattern of criminal activity" that is an element of the offense of conviction, without regard to whether the particular criminal conduct of the defendant which directly harmed the victim was alleged in a count to which the defendant pled guilty or was even charged in the indictment. Thus, the outer limits of a VWPA § 3663(a)(2) restitution order encompass all direct harm from the criminal conduct of the defendant which was within any scheme, conspiracy, or pattern of activity that was an element of any offense of conviction.

Id. at 277 (citations omitted).

Here, Matos pled guilty to three counts of wire fraud, in violation of 18 U.S.C. § 1343. Because a "scheme or artifice to defraud" is an element of the wire fraud offenses to which Matos pled guilty, see 18 U.S.C. § 1343, the district court correctly applied MWRA § 3663A(a)(2).

-25-

Matos argues that he engaged in no conduct whatsoever toward Mr. Agueda, but we find that the district court had reason to believe that Agueda was a MVRA victim of Matos's conduct. At sentencing, Matos objected to the district court's consideration of five properties in determining the amount of loss on the ground that he had no financial interest in them. The court sustained the objection. 22 Burr Street was not one of the properties to which Matos objected. Moreover, while Matos is correct that the PSR does not list him as having been involved in the sale of 22 Burr Street, the superseding indictment does state as much.

Thus, we find that Matos has not met his burden of showing that the district court's order of restitution to Mr. Agueda was plain error.

## 2. Restitution as to Equicredit Corporation

Similarly, as to Equicredit, Matos argues that the wire fraud counts to which he pled guilty did not involve Equicredit as the lender, and therefore, as the restitution award to Equicredit derived from dismissed counts, it should be vacated.

As discussed above, this is a case in which under 18 U.S.C. § 3663A(a)(2), a "victim" is defined as one directly harmed by the defendant's conduct "in the course of the scheme, conspiracy, or pattern of criminal activity" "without regard to whether the particular criminal conduct of the defendant which directly harmed the victim was alleged in a count to which the

-26-

defendant pled guilty." Hensley, 91 F.3d at 277. Here, both the superseding indictment and the PSR name Equicredit as a victim of the wire fraud and money laundering conspiracy with which Matos was charged. The district court properly ordered him to pay restitution to Equicredit.

Matos makes one final argument: that the district court did not explain how it arrived at the restitution amount of $350,000 to Equicredit, and consequently may not have offset any amounts that Equicredit was able to recover. Matos notes that the PSR lists the amounts that Equicredit recovered in loan payments and foreclosures as "unknown." He argues that the case must be remanded in order to determine the amount of Equicredit's actual loss and to offset any loss by any amount recouped by Equicredit, including any resale of the relevant properties at foreclosure.[14]

But Matos "made no effort to highlight any deficiencies in the court's calculations" of the restitution order at

_____

[14]Matos appears to make this argument as to Agueda as well. He states that the district court may not have offset the amounts recovered by "the victims," and therefore we must remand in order to determine "the amount of actual loss, not the intended loss incurred by the victims Equicredit and Aguedo [sic], as the result of Matos' conduct, and to offset any loss by any amount recouped by the victims . . . ." While the district court may not have articulated the basis for its order of $8,331 to Mr. Agueda, there is a clear basis in the record for the order. Agueda's victim impact statement provides that Agueda incurred a total of $16,662 in out-of-pocket expenses on the 22 Burr Street property. The restitution order of $8,331 is exactly half that amount. The district court separately ordered one of Matos's co-defendants, Michael Bergdoll, to pay the remaining $8,331 to Mr. Agueda in restitution when Bergdoll was sentenced.

sentencing, <u>United States</u> v. <u>Curran</u>, 525 F.3d 74, 84 (1st Cir. 2008), and he cannot demonstrate that the restitution order of $350,000 to Equicredit amounted to plain error.  The PSR reflects that the loss amounts set forth in the superseding indictment for Equicredit were $4,028,668, and the victim impact statement submitted by Bank of America listed total losses in the amount of $4,827,537.65.  Under the MVRA, the district court had discretion to order Matos and his co-defendants to make restitution to Equicredit and apportion their liability based on their level of contribution to the total loss, <u>see</u> 18 U.S.C. § 3664(h), and the district court apparently did so here, ordering Matos to pay $350,000 in restitution to Equicredit, and ordering several of his co-defendants to also pay restitution to Equicredit, in amounts ranging from $1,245,157.44 (Defendant Albert Innarelli) to $10,000 (Defendant Mark McCarthy).[15]

Though it might have been preferable for the district court to explain how it arrived at the restitution figure of $350,000 in Matos's case, we have held that "absolute precision is not required in calculating restitution under the MVRA," and that "only a modicum of reliable evidence is required to establish a

---

[15]It appears from the record that the court ordered eight of the defendants, including Matos, to pay a combined total of $2,062,015.44 in restitution to Equicredit.  We note that this is far less than the loss amounts listed for Equicredit in either the superseding indictment or Equicredit's (Bank of America's) victim impact statement.

restitution award." United States v. Mahone, 453 F.3d 68, 74 (1st Cir. 2006) (citations and internal quotations omitted).

Thus, we find that the district court did not commit plain error in ordering $350,000 in restitution to Equicredit.[16]

## III. Conclusion

For the foregoing reasons, we vacate and remand for resentencing on the term of supervised release and affirm Matos's sentence in all other respects.

---

[16]We contrast our holding in this case with our holding in the appeal of Matos's co-defendant, Albert Innarelli, see Innarelli, 524 at 293-94 (1st Cir. 2008), where we remanded to the district court to recalculate restitution. In that case, on de novo review, we noted that the record included calculations by a defense expert as to the amounts which the lender-victims had recovered through the resale of the properties at issue after foreclosure. Id. at 293.