An appropriate order will issue.

**UNITED STATES of America,**

v.

**Deborah WAGNER, Defendant.**

**CRIMINAL NO. 4:15cr28**

United States District Court,
E.D. Virginia,
Newport News Division.

Nunc Pro Tunc November 15, 2017

Signed November 17, 2017

---

Brian James Samuels, Kaitlin Courtney Gratton, United States Attorney's Office, Newport News, VA, for United States of America.

## ORDER

ROBERT G. DOUMAR, UNITED STATES DISTRICT JUDGE

This matter comes before the Court to determine the amount of restitution Deborah Wagner ("Defendant") owes in the above-captioned matter. As more fully set forth herein, Defendant is ordered to pay restitution in the amount of $1,845,665.36 jointly and severally with Keith Kosco (4:14cr66) to the extent of $213,045.31 and with Brendan Hawkins (4:14cr74) to the extent of $546,904.00. Since Defendant and her law firm were involved in as many as 2,462 transactions, determining the amount of restitution owed in this case is and was quite complex.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On October 15, 2015, Defendant was named in an eleven-count indictment.

Count One charged Defendant with Conspiracy to Commit Mail and Wire Fraud, in violation of 18 U.S.C. § 1349. Counts Two through Five charged Defendant with Mail Fraud, in violation of 18 U.S.C. §§ 1341 and 1342. Counts Six through Eight charged Defendant with Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 1342. Counts Nine through Eleven charged Defendant with Aggravated Identity Theft, in violation of 18 U.S.C. §§ 1028A and 1028(2). Forfeiture of assets was cited pursuant to 18 U.S.C. §§ 981 and 982 and 21 U.S.C. § 853(p). ECF No. 11. On September 9, 2016, Defendant pled guilty, pursuant to a written plea agreement with the Government, to Count One. ECF No. 49.

According to the Agreed Statement of Facts, Defendant and her co-conspirators engaged in a scheme that recruited straw purchasers to serve as grantees in fraudulent transfers of timeshare units. From 2011 to 2013, Defendant and her employees, acting in and through her law firm, Wagner & Hyman, provided third party transfer services to GoodBye Timeshare, owned and operated by Brendan Hawkins. Statement of Facts, ECF No. 51 ¶¶ 2–3. From August 2013 until the end of 2013, Defendant provided similar services to Exotic Equity Transfers, owned and operated by Keith Kosco. Id. ¶¶ 2, 4, 9. Mr. Kosco and Mr. Hawkins, through their respective companies, would charge the original owners a substantial fee to transfer their timeshare units (usually three times the maintenance fees) while assuring the original owners that such transfers were legal and legitimate. Id. ¶¶ 6–7. Defendant's role was to aid in the transfer to straw purchasers by having a fraudulent deed and contract

produced to document the sale. Id. ¶ 14. Defendant and her co-conspirators were aware that the straw purchasers had neither the ability nor the intention of satisfying the financial obligations of timeshare unit ownership. Id. ¶ 11. For instance, at least one of the many straw purchasers was a jail inmate who did not know the conspirators were transferring units into her name. Mr. Hawkins and Mr. Kosco, through their companies, paid fees to Defendant and her law firm for her role in the scheme. Id. ¶ 10.

When resorts began objecting to certain transfers because of the repeated use of a straw purchaser, Defendant, her employees, and others would attempt to shift the transfer into the name of another straw purchaser. Id. ¶ 21. In addition, Defendant formed a separate nominee company, Vacation Match, LLC, with a business address at the location of a tanning salon she owned, for the purpose of finding new straw purchasers (many of these straw purchasers were paid $20–$50 for the use of their identities). See Virginia Corporate Records, ECF No. 61–5. The straw purchasers did not pay their fee obligations, resulting in losses of $2,050,739.29 to 14 resorts.[1] See Statement of Facts, ECF No. 51 ¶ 29; Losses by Resort, ECF No. 92–5.

On July 20, 2017 this Court sentenced Defendant to imprisonment for fifty (50) months. ECF No. 85. At that time, the Court recognized that the Mandatory Victim Restoration Act ("MVRA"), 18 U.S.C. § 3663A, applied and thus the court must order restitution, but withheld ruling on the amount of restitution for 90 days pursuant to 18 U.S.C. § 3664(d)(5). The Court ordered the parties to file supplemental

---

1. This number is about $1,000 lower than the figure requested by the Government in its initial Position on Restitution, ECF No. 92 at 2, and used by the Court in the November 15, 2017 hearing. The Court enters its Order consistent with this lower figure because it is derived from the chart that Investigator Scott Salter assisted in preparing, and on which he based his testimony. See Salter Decl., ECF No. 97–1 at 1.

briefs regarding the amount of restitution due within 21 days from sentencing, and allowed each party 14 days to respond to the other's brief. ECF No. 85. The United States timely filed its Position on Restitution on August 11, 2017. ECF No. 92. On August 16, 2017, Defendant filed a motion requesting the Court delay entering restitution because Defendant was waiting on a transcript of the sentencing hearing that she intended to cite in her position on restitution. ECF No. 93. On August 25, 2017, Defendant filed her Position on Restitution. ECF Nos. 95, 96. The Government timely replied to Defendant's Position on September 8, 2017. ECF No. 97.

The Court set a hearing on the amount of restitution to occur on October 23, 2017. ECF No. 104.[2] The Defendant was incarcerated in West Virginia and was not able to physically attend the hearing as scheduled, so in the interests of justice the Court converted the hearing into a scheduling conference. ECF No. 110.[3] At the scheduling conference, the Court reset the hearing for November 15, 2017. ECF No. 112. On October 25, 2017, the Court accepted a sworn waiver of presence filed by Defendant and ruled the November 15, 2017 amount of restitution hearing would proceed without Defendant present. ECF No. 116.

**2.** The Court recognized the hearing would extend the Court's determination more than 90 days past sentencing but, in the interests of justice, the Court availed itself of the jurisdiction recognized in Dolan v. United States, 560 U.S. 605, 611, 130 S.Ct. 2533, 177 L.Ed.2d 108 (2010). ECF No. 104 at 1 n.1. Extending consideration past the 90–day deadline could not and did not prejudice either party. Indeed, the Defendant had asked the Court to delay entry of restitution, ECF No. 93, Defendant filed her Position on Restitution after the Court's initial deadline for doing so had lapsed, see ECF No. 95, and the Court set a hearing outside the 90–day deadline primarily to provide Defendant an opportunity to present any evidence to dispute the amount of restitution presented by the Government, see

## II. LEGAL STANDARD

Where the Mandatory Victim Restoration Act ("MVRA") applies, as it does here, "a restitution order imposed under the MVRA is mandatory." United States v. Roper, 462 F.3d 336, 338 (4th Cir. 2006). Restitution must be ordered "in the full amount of the victim's losses ... irrespective of the defendant's financial condition or ability to pay." United States v. Ritchie, 858 F.3d 201, 207 (4th Cir. 2017).

Where property is lost, the defendant must pay (1) the value of the property on the date of loss or sentencing, whichever is greater, minus (2) the value of any property returned, as valued on the date of its return. 18 U.S.C. § 3663A(b)(1)(B).

It is the Government's burden to demonstrate the amount of restitution due, by a preponderance of the evidence. 18 U.S.C. § 3664(e). But "once the Government has satisfied its burden to offer evidence supporting its restitution calculation, the burden shifts to the defendant to dispute that amount with her own evidence." United States v. Stone, 866 F.3d 219, 227 (4th Cir. 2017). "[A]bsolute precision is not required in calculating restitution under the MVRA." United States v. Matos, 611 F.3d 31, 45 (1st Cir. 2010). "So long as the

ECF No. 104 at 2 (citing United States v. Stone, 866 F.3d 219, 227 (4th Cir. 2017) ("[O]nce the Government has satisfied its burden to offer evidence supporting its restitution calculation, the burden shifts to the defendant to dispute that amount with her own evidence.")).

**3.** The Court learned Defendant would not be able to be present on October 17, 2017 when Defendant moved to be present at the hearing. ECF Nos. 107. Defendant withdrew that motion without explanation two days later, ECF No. 108, but because the restitution hearing was part of sentencing, the Court ruled Defendant was required to be present unless she waived that right. ECF No. 109.

basis for reasonable approximation is at hand, difficulties in achieving exact measurements will not preclude a trial court from ordering restitution." United States v. Mejia, 326 Fed.Appx. 710, 712 (4th Cir. 2009); see also United States v. Gushlak, 728 F.3d 184, 195–96 (2d Cir. 2013) (" 'reasonable approximation' will suffice, especially in cases in which an exact dollar amount is inherently incalculable. * * * the MVRA requires only a reasonable approximation of losses supported by a sound methodology"); Matos, 611 F.3d at 45 ("only a modicum of reliable evidence is required to establish a restitution award").

## III. DISCUSSION

### A. THE GOVERNMENT'S REQUEST FOR RESTITUTION

The Government asks this Court to award restitution against Defendant in the amount of $1,845,665.36, jointly and several with Brendan Hawkins to the extent of $546,904.00 and with Keith Kosco to the extent of $213,045.31.[4] ECF No. 97–2 at 1. This amount is the sum of unpaid maintenance fees reported by 14 resorts, which fees were not paid because of Defendant's fraudulent transfers. Salter Decl. ECF No. 97–1 at 1. Defendant could foresee losses due to unpaid maintenance fees because avoiding future fees was the value the conspiracy's customer's received in exchange for their payment, and the conspirators set the rate they charged customers based on triple the maintenance fee.

The losses, by resort, are reflected in Exhibit E to the Government's Position on Restitution, ECF No. 92–5, less 10% to

remove late fees and interest, Salter Decl. ECF No. 97–1 at 1. The Government's investigator, Former FBI Agent Scott Salter, avers that the chart is "a fair and accurate summary chart showing the losses incurred over the course [of] 864 transfers, broken down by resort property and straw purchaser." Id. at 1. During the November 15, 2017 hearing, Mr. Salter testified that he compiled the chart based on each resorts' responses to subpoenas from the Government regarding unpaid maintenance fees incurred due to straw purchasers into whose name Defendant and her co-conspirators moved timeshare units.

The Government further argues its figure is conservative because it seeks restitution for only 864 transactions whereas, based on the invoices Defendant sent to her co-conspirators, Defendant was involved in as many as 2,462 transactions. Salter Decl. 97–1 at 1. The Government seeks an award regarding only these 864 transactions because it limits the losses it requests to fees not paid by straw purchasers for whom only Defendant and her law firm prepared fraudulent paperwork. See ECF No. 82 at 2. The Government does not request fees related to known straw purchasers whose fraudulent paperwork may have been facilitated by a separately prosecuted conspirator. See id. Based on the average loss per transaction, the Government argues the total losses Defendant caused could be as high as $5,855,523.18. Salter Decl., ECF No. 97–1 at 1.

---

**4.** Brendan Hawkins was ordered to pay $546,904.00 in restitution to resort victims. United States v. Hawkins, Case No. 4:14–cr–74, ECF No. 24 (E.D. Va. Apr. 20, 2015). Keith Kosco was ordered to pay $741,027.18 in restitution to resort victims. United States v. Kosco, Case No. 4:14–cr–66–1, ECF No. 80 (E.D. Va. Jul. 13, 2015). The Government requests Defendant be jointly and several liable with Hawkins in the full amount of his restitution order because Defendant facilitated all of Hawkin's fraudulent transactions. Salter Decl., ECF No. 97–1 at 1. The Government requests Defendant be jointly and severally liable with Kosco in the amount of $213,045.31 because Defendant facilitated approximately 28.75% of Kosco's fraudulent transactions. Id. at 2.

## B. THE DEFENDANT'S ARGUMENTS

Defendant raises a number of arguments to decrease or eliminate the amount of restitution she should owe to the resort victims. The arguments fall into five general categories: (1) the Government's request does not award restitution to the appropriate victims, (2) Defendant did not cause as much loss as the Government claims, (3) the Government's method of calculating loss was over-inclusive or otherwise incorrect, (4) the Government has presented insufficient evidence to carry its burden, and (5) Defendant's restitution order should not exceed the amount of her co-conspirators' orders to avoid unwarranted sentencing disparities.

### 1. The Victims

Defendant argues the Government has not identified the appropriate victims entitled to restitution because (1) the resorts are real property, not "persons" entitled to restitution and (2) the real victims are the people that owned other timeshares. ECF No. 95 at 2–3.

When awarding restitution pursuant to the MVRA,

> the term 'victim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C.A. § 3663A(a)(2).

█ As a threshold matter, the Government does not seek restitution in favor of real property, but in favor of resort associations and management companies that are entities, such as corporations or limited liability companies. See Salter Decl., ECF No. 97–1 at 2. These entities are duly organized under their respective state laws and are legal "persons" able to sue, and be sued.[5] A victim under the MVRA need not be a natural person; courts regularly award restitution in favor of legal persons and even public organizations. See, e.g., United States v. Allen, No. 4:11–cr–107 at ECF No. 23 (E.D. Va. Mar. 28, 2012); United States v. Garries, No. 4:08–cr–50 at ECF No. 119 (E.D. Va. Oct. 19, 2009); see also United States v. Oceanpro Industries, Ltd., 674 F.3d 323, 340–42 (4th Cir. 2012) (holding MVRA provided for restitution in favor of Maryland and Virginia).

Defendant's next argument—that the owners of other timeshares in the particular associations, not the resort entities, are the true and only victims entitled to restitution—contradicts her statement of facts and plea agreement. In her plea agreement, Defendant agreed to make restitution to the "victims of the conduct described ... in the statement of facts." ECF No. 50 ¶ 8. In her statement of facts, Defendant agreed that she "caused the

---

5. For example, Florida law provides for the management of timeshares by the developer, a management firm, or an owner's association. Fla. Stat. § 721.13. The managing entity must act in the capacity of a fiduciary to the purchasers of the timeshare plan, § 721.13(2)(a), and is responsible for collection of all assessments for common expenses, § 721.13(3)(b). As corporate entities, the managers can sue and be sued. Other relevant states also have statutes governing timeshares and condominium associations. See, e.g., Ariz. Rev. Stat. Ann. § 33–1201, et seq.; Ariz. Rev. Stat. Ann. § 32–2197, et seq.; Mass. Gen. Laws Ch. 183A; Mass. Gen. Laws Ch. 183B; Miss. Code Ann. § 89–9–1 et seq.; Miss. Real Estate Comm. Rules & Regs., Rule VIII; Nev. Rev. Stat. § 117.010, et seq.; Nev. Rev. Stat. 119A.010, et seq.; N.C. Gen. Stat. Ann. § 47C–1, et seq.; N.C. Gen. Stat. Ann. § 93A–39, et seq.; S.C. Code Ann. § 27–31–10, et seq.; S.C. Code Ann. 27–32–10, et seq.; Va. Code § 55–79.39, et seq.; Va. Code § 55–360, et seq.

transfer of timeshare units into the names of straw purchasers" and that "[t]hese fraudulent transfers resulted in losses arising from unpaid maintenance fees and real estate taxes to resort companies and related community entities associated with the straw purchasers used by Wagner, her employees, and others." ECF No. 51 at ¶ 29. Defendant cannot now back out of her plea agreement and statement of facts in an attempt to avoid full restitution.

Indeed, the remaining facts of this case establish that the resorts were the victims directly and proximately harmed by Defendant's fraud. Her fraud was directed at the resorts: Defendant and her conspirators sent the straw purchasers' identity paperwork to consummate the fraud to the resorts. Statement of Facts, ECF No. 51 ¶ 12. They mailed the fraudulent transfer documents to the resorts. Id. ¶ 14. The resorts rejected straw purchasers who they knew would not pay or believed to be a scam. Id. ¶¶ 16–18. Defendant reviewed and approved a supplemental deed addendum in which grantees were required to acknowledge and affirm their ability and willingness to pay all future timeshare fees in case the resorts ever alleged anyone involved with the transfer was a knowing participant in the fraud. Id. ¶ 19. And Defendant shifted transfers into the names of different straw purchasers in order to avoid detection of the scheme by resorts or as a result of a resort's objection after learning certain straw purchasers did not pay required fees. Id. ¶ 21. It was the resorts who charged the fees that went unpaid as a result of Defendant's fraud, and it was the resorts who were required to pay the taxes and maintenance costs that formed the basis of those fees when Defendant's straw purchasers did not pay. See supra, note 5.

Defendant's position is analogous to arguing insurance companies should not be able to recover for frauds against them because they simply raise their rates or—in the case of mutual insurance companies—collect additional capital from their members. This is, of course, absurd. Just as an insurance company can recover for frauds against it, even if it requires others to pay more due to its fraud losses, so too must the resort victims recover even if they require others to pay more due to the resorts' fraud losses.

The Court finds—as the Defendant agreed in her statement of facts—the appropriate victims were the resort companies and related community entities, not the owners of other timeshares.

## 2. The Amount of Loss Defendant Caused

### a. The Value of Property Lost as a Result of the Fraud

■ Defendant argues the Government has not proved the resort victims suffered actual losses because maintenance fees were a "speculative revenue stream." ECF No. 95 at 4–6. She argues the speculative nature of the losses is established by the grantor's willingness to pay a fee to rid themselves of the timeshare interests. ECF No. 95 at 5. "[E]ach of these individuals were selling their units, mostly because they did not want to or could not afford the fees associated with the units." Id. at 6.

Again, Defendant attempts to back out of her plea agreement and statement of facts, in which she agreed her "fraudulent transfers resulted in losses arising from unpaid maintenance fees and real estate taxes." ECF No. 51 ¶ 29. The evidence presented further supports Defendant is wrong on several grounds. First, in response to Defendant's questioning, Mr. Salter testified that the timeshare properties at issue were not necessarily distressed or in default. Second, the grantors necessarily had sufficient funds to pay the

maintenance fees because—to the extent they were behind on payments—they paid all back fees before the transfer and then they paid the conspirators three times the maintenance fees in order to dispose of their properties. Moreover, the grantors' willingness to pay three times the maintenance fee to dispose of the properties emphasizes that they intended to honor their obligations.

Defendant's argument is akin to arguing restitution or damages should never be allowed for mortgage fraud because it is possible a legitimate mortgagee would default. Even if it was possible an owner could default, Defendant's actions guaranteed there would be no payment from the prior owner and guaranteed there would be no payment from the new straw purchaser.

The Court finds, as a matter of fact, that payment of the fees and thus the resort victims losses was not speculative. The resort victims suffered losses in the amount of the maintenance fees not paid by the straw purchasers into whose name Defendant transferred timeshare units.

b.  The Value of Property Returned

█ Defendant argues her restitution award should be offset by the value of the units recovered from the straw purchasers through foreclosure to avoid a windfall to the resorts. See ECF No. 95 at 6. Based on the facts before the Court, however, the Court finds a reduction is not appropriate.

In his declaration, Mr. Salter avers that although foreclosures or deed backs "result in the resort association gaining a timeshare unit, a vacant unit does not generate the needed maintenance fees going forward. A vacant unit also does not generate back maintenance fees, which are the source of the loss in this case." ECF No. 97–1 at 2. Indeed, at the hearing, Mr. Salter testified the resort associations "write off" past unpaid maintenance fees when a unit is sold to a new owner. The

conclusion that resorts do not recover past maintenance fees from foreclosure is also supported by the victim letters the Government submitted. Defender Resorts, for example, reports:

> Any assertion that these financial losses are easily recuperated are totally untrue. As owners take over the association's affairs from the developer, the body loses any traditional sales and marketing expertise, no different from most associations. The timeshare distinction is there is no credible secondary market and the Association must bear any and all expense of sales and marketing, which is almost always outside their expertise and certainly is not the mission of the Association. An association must first go through the process of foreclosure of the interval which process can take one to two years, including the obvious discovery by the Association that this new owner has no intention of paying any fees.

ECF No. 61–3 at 1. Another association reports that "[d]epending on the state, the cost to foreclose can total anywhere from $300 to $2,000 per interval. Often Associations do not have the funds to pay for this process. As a result, the intervals remain in the name of the non-paying owner indefinitely." ECF No. 61–6 at 1. The testimony from Mr. Salter and the letters from the resort victims are consistent with the premise of the conspirators' scheme: there was no reasonable market for owners to sell timeshare units, so rather than sell the units the owners paid the conspirators to be rid of the ongoing obligations. That owners would have paid to be rid of their units when they could have received money in exchange for them defies logic.

In response, Defendant simply asserts that one unit was sold at a profit and other units may have been sold at a profit. The Defense does not provide sufficient

evidence to overcome the Government's evidence.[6] The Court credits Mr. Salter's testimony, credits the letters from the victims, and finds a reduction in restitution based on possible foreclosure recoveries is not appropriate and therefore denies any such reduction.

### 3. The Method of Determining the Amount of Each Victim's Loss

■ Defendant raises several arguments that the loss figure requested by the Government is incorrect, ECF No. 81 at 2, but the Court finds the method used to reach the restitution figure ensures Defendant will only pay restitution to victims she directly and proximately harmed, in the amount of their harm.

In her Supplemental Position on Sentencing, Defendant argues "in adding up the letters and invoices provided by the resorts to the Government, the total of the same as provided appears to be approximately $1,569,329.32," not $2,050,739.29 (the Government's figure before reducing by 10% to remove late fees and interest). ECF No. 81 at 2. At the hearing, Defendant's counsel represented they reached their differing figure based on Defendant's invoices. The Government employed the method described supra in Section III.A, which it described and supported with credible testimony from the responsible investigator. The Defendant did not present credible evidence to dispute this amount, merely its allegations. The Court finds the Government's method was reliable and resulted in the correct amount of restitution.

Defendant also argues the Government's request includes amounts of loss that resulted from actions taken on dates when Defendant was not yet involved in the conspiracy. Based on the Government's

method, the Court finds this would not be possible. The restitution award includes only losses caused by straw purchasers whose transactions Defendant facilitated.

Defendant finally argues the invoices show one-third of the transactions were deeded back or cancelled filings and should not count as transactions since "nothing was transferred.... No loss or restitution should be attributable to legitimate deed backs...." ECF No. 95 at 6. The Court finds the method employed ensured only unpaid fees are included in the restitution award. To the extent one-third of the transactions in which Defendant participated did not result in losses, these transactions are not included in the restitution award. Indeed, the award includes losses associated with less-than half of Defendant's transactions.

### 4. The Sufficiency of the Evidence

■ Defendant argues the Government failed to provide a "complete accounting of the losses to each victim" and instead provided "various unsworn and anonymous summaries of unpaid fees that were allegedly due to either developers, subsidiary management companies, or property owners associations." ECF No. 95 at 4. The Court finds the evidence presented credible and reliable for purposes of determining restitution. Indeed, the voluminous evidence presented is consistent with types of evidence regularly used to determine and award restitution. See United States v. Hamdan, 559 Fed.Appx. 59, 61 (2d Cir. 2014) (affirming restitution determination based on letters setting forth the costs to the victims); United States v. Hall, 467 Fed.Appx. 47, 49 (2d Cir. 2012) (submission of affidavits not required to prove restitution); United States v. Dang, 492 Fed.Appx. 730, 731 (9th Cir. 2012) (affirm-

---

6. Indeed, because these properties were deeded, it is possible they may have been subject to a mortgage or some other interest such that, even if the units were sold, the resorts would not receive any profits. Any recovery by the resorts based on foreclosures is speculative at best.

ing district court's finding that bank records had sufficient indicia of reliability to support a restitution order); United States v. Caramadre, No. CR 11-186, 2013 WL 7138106, at *6 (D.R.I. Nov. 6, 2013) ("as long as they clear the reliability bar, the court can consider written statements of counsel, affidavits and letters from victims and other documentary evidence, sworn and unsworn, in making the restitution determination ... summary charts can meet the Government's burden when they are sponsored by a witness to explain how they were prepared"), aff'd 807 F.3d 359 (1st Cir. 2015). The Court finds the Government's evidence is credible, reliable, and sufficient to establish the amount of restitution by a preponderance of the evidence.

### 5. Disparities With Conspirators

█ Defendant argues the Court should not award greater restitution against Defendant than it awarded against her co-conspirators to avoid disparities in sentencing. However, Defendant cites no authority suggesting this is a proper consideration under the MVRA. The Court must award full restitution to victims of defendant's offense. Defendant's award is higher because she pled later and the Government therefore discovered more losses before her sentencing. See ECF No. 92 at 4. The MVRA does not allow the Court to deprive Defendant's victims of full restitution simply because her co-conspirators received a lower order based on the time and circumstances of their pleas.

### IV. CONCLUSION

Accordingly, it is **ORDERED** that:

1. Pursuant to 18 U.S.C. § 3663A(a)(1), the defendant is ordered to pay restitution in the amount of **$1,845,665.36** jointly and severally with Keith Kosco (4:14cr66) to the extent of $213,045.31 and with Brendan Hawkins (4:14cr74) to the extent of $546,904.00. Specifically, the Court orders Defendant Deborah Wagner to pay the following victims, by name and address, the following amounts of restitution:

| Victim | Loss Amount |
|---|---|
| Blue Green Vacations<br>4960 Conference way N, Suite 100<br>Boca Raton, Florida 33431 | $138,424.90 |
| Coral Sand<br>66 Pope Avenue<br>Hilton Head, South Carolina 29928 | $7,382.66 |
| Crown Resorts<br>2000 Bienville Boulevard<br>Ocean Springs, Mississippi 39566 | $14,675.32 |
| Defender<br>6301 North Kings Highway<br>Myrtle Beach, South Carolina 29579 | $73,826.62 |
| Diamond Resorts<br>10600 West Charleston Boulevard<br>Las Vegas, Nevada 89135 | $612,760.91 |
| Festival Resorts<br>39 Patton Avenue<br>Ashville, North Carolina 28801 | $129,196.58 |
| Gold Key<br>300 32nd Street Suite 500<br>Virginia Beach, Virginia 23451 | $51,678.63 |
| Island Link<br>6301 North Kings Highway<br>Myrtle Beach, South Carolina 29572 | $3,691.33 |
| Spinnaker Resorts<br>35 DeAllyon Avenue<br>Hilton Head, South Carolina 29928 | $18,456.65 |
| Starwood Hotels and Resorts<br>15147 N. Scottsdale Road<br>Scottsdale, Arizona 85255 | $199,331.86 |
| Summer Bay Resort<br><br>17805 US 192<br>Clermont, Florida 34714 | $42,450.30 |
| Vacation Village Resorts<br>2626 E. Oakland Park Boulevard<br>Fort Lauderdale, Florida 33306 | $276,849.80 |
| Westgate Resorts<br>2801 Old Winter Garden Road<br>Ocoee, Florida 34761 | $27,684.98 |
| Wyndham Vacation Ownership<br>6277 Sea Harbor Drive<br>Orlando, Florida 32821 | $249,164.82 |

2. The amount of restitution paid to any victim, collectively, shall not exceed the victim's total loss from the offenses of conviction.

3. Interest is waived.

4. Notwithstanding any other provision of this Restitution Order or the sentence imposed, including the directive to make periodic payments, restitution is due in full and payable immediately from assets

known and unknown and including assets identified in the Presentence Report. The Government may enforce restitution at any time.

5. If incarcerated, the Court encourages the defendant to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, to comply with the provisions of the financial plan, and to meet the defendant's financial obligation, pursuant to 28 C.F.R. § 545.10–11.

6. If restitution is not paid in full immediately, the defendant shall pay to the Clerk at least $1,000 per month or 25 percent of net income, whichever is greater, beginning 60 days after release from any period of confinement, or 60 days after sentencing if no confinement is imposed.

7. All payments shall be made to the Clerk of Court, United States District Court, 600 Granby Street, Norfolk, Virginia 23510–1811. However, while incarcerated, Defendant is to tender all payments to the Bureau of Prisons.

8. Within 30 days of (a) any change of name, residence, or mailing address; and/or (b) any material change in economic circumstances that affects the ability to pay restitution, the defendant shall notify the Clerk of Court and the United States Attorney's Office, Financial Litigation Unit, 8000 World Trade Center, Norfolk, Virginia 23510.

9. No delinquent or default penalties will be imposed except upon Order of the Court.

10. The Clerk of Court shall first apply money received to satisfy the special assessment imposed in this case.

11. The Clerk of Court shall distribute the funds to the victims on a pro rata basis. The Clerk may withhold distribution

of any restitution amounts until the sum available for restitution to each victim is at least $1.00. If the Clerk of Court does not receive sufficient funds to meet this threshold, the Clerk shall present a petition to modify this condition.

The Clerk is **DIRECTED** to forward a copy of this Order to all Counsel of Record.

**IT IS SO ORDERED.**